THE UNITED STATES TRUST COMPANY OF NEW YORK, Receiver, &c., v. THE UNITED STATES FIRE INSURANCE COMPANY and others.

An order declaring a banking association insolvent, and appointing a receiver in pursuance of the act to enforce the responsibility of stockholders, &c. (*ch. 226 of* 1849), appeared by its terms to have been founded upon applications made by several creditors, which were filed. Upon appeal the only application returned with the order contained no averment that the association had issued bills to circulate as money; *Held,* that it was error in the appellate court to reverse the order for this omission without having before it the other applications, in which that averment might have appeared.

Conceding such averment to be a jurisdictional one, its absence will not defeat the subsequent proceeding against stockholders before the Supreme Court at special term, which has general jurisdiction of the subject; such proceeding commencing, so far as the stockholders are concerned, after the appointment of a receiver, by notice to them to appear before a referee, and ending in a determination establishing their several liabilities. This is a judgment conclusive in respect to a particular jurisdictional fact, as in other cases where a court has general jurisdiction of the subject and has brought the parties within its process.

The provision charging stockholders with personal liability, by the constitution and the act of 1849, is within the power reserved by the legislature in the general banking law to alter it; is to be deemed voluntarily assumed by the stockholders of associations organized since the act, and is not a law impairing the obligation of contracts.

The act of 1849 is not unconstitutional on the ground that it deprives stockholders of the right of trial by jury. The settling the affairs of insolvent corporations and compelling contribution by their members was, before the constitution, within the jurisdiction of courts of equity, and no right to trial by jury existed in such cases.

The proceeding of the receiver, under the act of 1849, to ascertain the debts and liabilities of the association is *ex parte*, and his report thereof is not conclusive upon the stockholders or other parties; but the whole question is open to litigation before the referee, who is to make the apportionment of the unsatisfied debts of the bank, and ascertain the persons liable therefor.

The proceeding before the referee and on the appeal from his report, where all parties interested have the right to be heard, though summary, is due process of law within the meaning of the constitution.

Personal service is not required to constitute due process of law. The legislature has the discretion to provide for bringing in parties by the publication of notice, in cases where actual personal service would be impracticable or dilatory.

The provision of the constitution subjecting corporations to be sued like natural persons is an enabling and not a restrictive one. It does not require that they should be proceeded against only by regular action, but leaves them to summary proceedings at the discretion of the legislature.

The liability of a stockholder is not limited to the amount of capital stock which he has agreed to pay in, but extends to an amount equal to the stock held by him and additional thereto.

The provisions of the act limiting the time for the referee to report, &c., are merely directory. An extension of the period beyond one year and ninety days after his appointment does not work a discontinuance of the proceeding.

The referee is not authorized, without proof, to apportion among the stockholders alleged liabilities of the bank reported by the receiver as not admitted by him nor established by the determination of a competent tribunal. It is incumbent upon the creditors claiming such debts to appear before the referee and establish them by affirmative proof.

Persons to whom stock has been transferred by way of hypothecation for debts, and in whose names it stands registered at the time of default, are stockholders within the meaning of the act and the constitution, and, as such, liable to an equal additional amount for the unsatisfied debts of the bank.

*It seems* that the provision for charging the equitable owner of stock is to be limited to cases where the party who is registered as the owner is merely a nominal holder, *e. g.*, a trustee authorized to invest the funds of another in such stock and without any personal interest.

A stockholder who is also a creditor of the bank cannot set off its indebtedness to him against his liability for its debts.

APPEAL by the receiver of the Empire City Bank, to review a judgment of the general term of the Supreme

Court, in the first district, by which a judgment of the special term, in the same district, was reversed.

A proceeding was commenced in January, 1855, under the act of 1849 (*ch.* 226) to enforce the responsibility of stockholders in banking corporations and associations, to wind up the Empire City Bank. One G. H. Purser, claiming to be a creditor of the bank for above $900, presented his affidavit to Mr. Justice ROOSEVELT, setting forth his claim as a depositor of the bank; that it had stopped payment on the ninth day of December preceding; that his check for a part of his balance, drawn on the twelfth December, had been refused payment, and that the said bank was insolvent, and asking, in effect, that it should be wound up according to the provisions of the act. The judge made an order that the corporation show cause on the seventeenth day of the same month; and in the meantime it was temporarily enjoined from paying out or disposing of any of its money or property, or incurring any debt, and he directed that a copy of the order should be served two days before the day for showing cause. On the twenty-fourth of January, counsel, on behalf of the applicant, of the bank and of certain other creditors of the bank, appeared before the judge, who examined the president and cashier on oath; and he thereupon made an order declaring that the bank was insolvent, and appointed the United States Trust Company of New York, a corporation created by statute in 1853 (*ch.* 204), a receiver of its property and effects, and the bank was enjoined from exercising any of its corporate rights, and from collecting its debts or paying out or transferring any of its money or property. It appeared by the recital of this order that several other creditors, who are named in it, besides Mr. Purser, had presented to the judge applications and petitions showing the indebtedness of the bank to them, and that their respective accounts had been presented and refused payment more than ten days before making the order, and that the bank, on the hearing before the judge, had put in

answers to the several applications; but neither the applications and petitions, except that of Purser, nor the answers of the bank, are made a part of the case printed upon the appeal. In the introductory part of the order, the Empire City Bank is stated to be "a joint stock association for banking purposes, *issuing bank notes to circulate as money.*"

On the 22d of July, 1855, the United States Trust Company of New York, as receiver, by its president, made a report on oath, setting forth that it had taken into its possession the property and effects of the bank, and had realized in cash the sum of $38,118.15, and that it had made one dividend among the creditors, on the twenty-eighth day of July, then instant, of the sum of $13,818.63, the time for making it having been extended by an order of Judge ROOSEVELT, and that it yet had in its hands, to be divided, $450.74, besides a sum of $19,353.10, retained to meet a presumed claim of the Sixpenny Savings Bank, which, it was stated, was also secured by a bond and mortgage, which was in course of foreclosure. The report also stated that there were unsatisfied debts and liabilities of the Empire City Bank, amounting to $140,889.81, including an amount of $59,851.40, which had not been allowed by the receiver, but which the alleged creditors threatened to litigate. The receiver also set forth, in certain schedules annexed to the report, an account of the money received, of the expenses incurred, of the unsatisfied debts and liabilities, and a statement of the persons who were and had been stockholders of the bank, since its organization in the year 1852, which was stated to have been made up from the stock ledger and list of stockholders kept by the bank ; and the report also contained a statement of certain moneys paid to redeem property of the corporation from liens, &c. In the schedule of debts and liabilities owing by the bank, annexed to the report, there is the following item: "Not allowed, and may be litigated, $59,851.40." The footing of the list is $154,708.44, from which there is deducted the amount of the dividend, $13,808.63, leaving the

sum of $140,889.08, being the amount of unsatisfied debts, &c., mentioned in the report.

On the 14th day of August, 1855, an order was made by Mr. Justice CLERKE, referring the report and list of stockholders to Stephen Cambreling, who was directed to apportion the debts and liabilities of the bank among the stockholders, according to the act referred to.

On the 29th of October, 1855, Mr. Justice COWLES made an order staying all proceedings before the referee, towards making the apportionment, for six months from the date of the order. A similar order was made by Mr. Justice ROOSEVELT, on the 28th day of April, 1856, by which those proceedings were stayed for a further period of six months from the expiration of the time given by the first mentioned order. These several orders were granted upon affidavits of Purser, the original applicant, and of Mr. Hone, a stockholder, stating the pendency of certain litigations involving the validity of alleged demands against and in favor of the receiver; the deponents expressing the belief that the result of these litigations would show that the actual indebtedness of the bank could be satisfied without collecting the liabilities of the stockholders. On the 16th of December following (1856), a report of the referee was presented to Mr. Justice ROOSEVELT, in which it was represented that, since the expiration of the order to stay proceedings, he, the referee, had been engaged in taking testimony relative to the apportionment, and that it would be impossible for him to complete it within the time limited by the statute. The justice thereupon made an order extending the time for completing the apportionment ninety days from that date. There was then an order made by another justice of the Supreme Court, on the application of a stockholder, staying all proceedings in the matter perpetually, and thus putting an end to the process, on the ground that it had been discontinued by the delay in reporting an apportionment within the time prescribed by the statute, but this order

was afterwards reversed by the general term on appeal; and on the 14th day of March, 1857, Mr. Cambreling reported to a special term in the first district a list of the stockholders whom he considered liable for the unpaid debts and liabilities of the bank, with the number of shares in respect to which each was chargeable, and an apportionment of the sum of $140,889.81 among them, in proportion to the shares of stock with which they were respectively charged; the number of shares thus assessed being eleven thousand four hundred and thirty-five and one-half. He also reported the proof which had been taken before him. The judge thereupon made an order that the parties interested show cause, on the twenty-sixth day of the same month, why the report should not be confirmed, and directed the order to be served upon the attorneys of the parties who had appeared before the referee.

Parties claiming offsets, or who desired to contest the apportionment as to charges against themselves, or as to the exemption of others who ought to be charged, were to serve exceptions upon the counsel of the receiver, and upon the persons claimed to be chargeable, who had been discharged by the referee. Pursuant to this direction, exceptions were put in by several parties, and the following, among many other objections, were taken : E. N. Purdy and some others objected that they were charged in respect to stock standing in their names, but which they held, as they alleged, as trustees for the bank, and not in their own rights; Jonathan Purdy and others objected that C. B. Conant, Israel Coe, G. L. Jones & Co. and Claudius L. Monell were stockholders, and had not been charged at all, and that John P. Hone, Jasper W. Hughes and Joseph O. Dorr had been charged for only a part of the stock held by them ; and said Purdy also claimed that he was entitled to a set-off for certain deposits, for which the bank was indebted to him, against his liability as a stockholder. The receiver excepted. because the referee had failed to make

apportionments against the United States Fire Insurance Company, Charles B. Conant, the Chatham Bank, James Struthers and Thomas W. Pearsall, respectively; these parties appearing, on the books of the bank, to be stockholders, though they proved, on the hearing before the referee, that their holding was by way of hypothecation for loans made by them to parties who held the stock, which loans, as the receiver alleged, had not been paid at the time of the failure of the bank. W. J. Staples objected to the charge against him, on the ground that he had sold his stock, *bona fide*, in November, 1854; but it had not been transferred on the books of the bank. Several of these parties, and others, objected to the report on the following among other general grounds: 1. That the statute of 1849 was not a constitutional enactment; 2. That the jurisdiction conferred upon the judge, prior to the order of reference, was of a nature which could only be exercised by the court, and that it was not shown that the bank belonged to the class which is subject to these proceedings, not being stated to be a bank of issue; 3. That the sum of $59,851.40, parcel of the amount apportioned among the stockholders as debts of the bank, had not been allowed or determined to be such by the receiver; 4. That jurisdiction had been lost by the delay which had occurred in making the apportionment and reporting it to the court

On the day for showing cause, counsel, on behalf of the receiver and of several of the stockholders, appeared, and the matters being adjourned to a future day, and the several parties objecting having been heard, Justice MITCHELL, who held the special term, made an order modifying the referee's apportionment in many particulars, and setting forth a new list of the stockholders chargeable according to the said modifications, confirming the first report as thus modified, and rendering final judgment against each person charged in the modified list, according to the directions of the statute. A number of the persons so charged appealed to the general term, and, upon the hearing of that appeal, separate orders

were made in respect to each of the appellants, reversing the respective judgments against them, and adjudging that they respectively go thereof without day. The ground of the reversal was stated to be, that it did not appear that the justices who entertained the proceedings had jurisdiction of the subject matters; it not being, as it was considered, stated in the papers that the Empire City Bank ever issued bank notes to circulate as money. The general term, it was stated, did not pass upon any other question. From these judgments of reversal, the receiver appealed to this court.

*J. M. Mason* and *E. S. Van Winckle,* for the appellant.

*J. W. Edmonds* and *S. Sanxay,* for the respondents.

By the Court, DENIO, J. I am of opinion that the determination appealed from cannot be sustained, upon the principle on which it was placed by the general term of the Supreme Court. It has not been denied that the bank actually issued circulating notes, procured according to the provisions of the general banking law; and that fact was incidentally stated in several of the papers which were before the court. For instance, the second application of Mr. Purser, upon which the order to show cause was granted, complains that the bank had, subsequent to its failure, paid demands against it, to a large amount, to creditors other than billholders and depositors; and the order to show cause itself recites that the bank is an association issuing bank notes, to circulate as money. Moreover, the receiver states in his report that he had received the securities, which had been placed in the hands of the superintendent of the banking department, over and above the amount of the outstanding circulation of the bank; and the affidavit of Purser and Hone, upon which one of the orders to stay proceedings was granted, contains an estimate of the

probable gains of the bank from the loss of its circulating notes which had been issued to customers. But the objection assumes that, in a special proceeding like this, the primary application must, in order to confer jurisdiction, contain a plain statement that the corporation belongs to the class mentioned in the statute—that is, that it is a corporation, or joint stock association, for banking purposes, issuing bank notes, &c., to circulate as money, after the 1st day of January, 1850. (*Laws* 1849, 340, § 1.) As the bank was incorporated in 1852, and as the incidental statements referred to show that it was all along assumed that the corporation was a bank of issue, the present objection is one of an exceedingly formal character.

If it be conceded that an omission in the application to bring the bank proceeded against within the statutory description would render the proceedings void, it was incumbent upon the parties who appealed to the general term to show that such a defect really existed, by causing to be returned all the papers which were before the judge who granted the initiatory order.

Now, it appears by that order that the judge had before him not only the application of Mr. Purser, but applications of the Union Bank, the American Exchange Bank, &c., of Isaac Frost and others, all creditors of the bank proceeded against, whose demands had been refused payment more than ten days before granting the order. If these papers, which are stated in the order to have been filed by the judge, contained the allegation, the omission of which is complained of, the order was unexceptionable. That they did contain it is rendered probable by the fact that the order describes the bank as one which issued circulating notes, a fact which the judge could regularly have known only from the papers before him. The other applications may have been deficient, as to the allegation, equally with the affidavit of Purser, but it cannot be affirmed that they were. until it be shown by their production. I think, there-

fore, that the general term fell into an error in reversing the order of the special term for want of jurisdiction, while a portion of the papers, in which the fact conferring jurisdiction, if it existed, would regularly appear, was not before them.

But there is another answer to this objection. The process against the stockholders commenced with the order of reference of August 14, 1855. They were not parties to what the act required to be done anterior to that order. The object of the prior proceedings, besides restraining the bank from further transactions, was to procure an account of the unpaid debts and liabilities, and a statement from its books of the several persons who were and had been stockholders, from January 1, 1850, when the personal liability first attached ; or, in this case, from its creation. Then the matter was committed to a referee, and notice in the nature of process was to be given to the persons appearing to be or to have been stockholders. (§§ 16, 17.) This was the beginning of the litigation. The referee's report was to be made to a special term of the Supreme Court, where the parties interested were entitled to appear and contest its conclusions, with the right to appeal to the general term and to this court, as in other cases.

It appears from this statement that the proceedings to charge the stockholders with the debts of the corporation are required to be had before a court of general jurisdiction, in which the parties sought to be charged are entitled to appear and defend, and to carry their cause from court to court, by way of review, as in the case of regular actions in that court. In such cases I understand the rule to be, that jurisdiction is to be presumed, unless the contrary appear. (*Foot* v. *Stevens*, 17 *Wend.*, 483, *and cases cited.*) The Supreme Court, at special term, had general jurisdiction of proceedings against the stockholders of banks of issue, to charge them with the unpaid debts of such banks. The parties now litigating were proceeded against as persons so

liable. Determinations in the nature of judgments were obtained against them, establishing such liability for the debts of the Empire City Bank. Assuming that nothing appeared to show whether that bank was or was not a bank of issue, still the judgments cannot be questioned for defect of jurisdiction; because they were rendered by a court having general jurisdiction of the subject, and the formal steps had been taken to subject the persons of the parties to the proceeding.

As an objection for defect of proof that the association was a bank of issue, the answer is that it appeared, *prima facie*, from the report of the receiver, that it issued currency, and nothing to the contrary was shown on behalf of the stockholders. It may be said, too, that this fact was impliedly conceded by the course of the proceedings; for neither in the voluminous testimony which was given on behalf of the stockholders before the referee, or the numerous exceptions which were taken to the report, is there any suggestion that the bank did not belong to the class which was subject to this jurisdiction. As such a fact, if it existed, could have been easily established, and would have put an end to the controversy by showing that no liability existed, the omission even to suggest it is an implied admission that no question of that kind could be successfully made.

That point being disposed of, the other objections may be taken up in their natural order. The statute under which the proceedings were had was challenged as being a violation of the constitution of the United States and of this state. By the federal constitution, no state can rightfully enact a law impairing the obligation of contracts. It is argued that, by the general banking law, the associations which it authorizes are alone responsible for its contracts, the shareholders being wholly exempt from liability; and it is insisted that this is in the nature of a contract between the state and the shareholders, and that the constitutional guaranty of the integrity of contracts, in the national consti-

tution, would be illusory, if a state could, by changing its constitution, subvert all existing engagements; and hence that the guaranty applies as well to state constitutions as to other state laws. Without denying or affirming the soundness of these positions, it is enough to say that the general banking law expressly reserves to the legislature the power to alter or repeal it (*Laws* 1838, 253, § 32), so that any changes, which it or the people think proper to make, are fully authorized by the provisions of the supposed contract itself. This bank was created subsequently to the constitution and to the act of 1849, and the provisions as to the personal liability of the shareholders attached to it from its inception, and in judgment of law were voluntarily assumed by the shareholders.

The act is also objected to on the ground that it takes away from the stockholders the right of trial by jury, and that it deprives them of their property and rights otherwise than according to the law of the land, and without due process of law, contrary to the bill of rights incorporated into the first article of the constitution of the state. The trial by jury is preserved by the constitution in all cases in which it had been used prior to its adoption. But in controversies cognizable in courts of equity, a jury trial was never, in general, resorted to. The facts were determined by the court or its officers, or by referees. Particular issues might be ordered for trial by a jury, but this was discretionary, except in a few cases where there were particular statutory provisions. The winding up and settling of the affairs of insolvent corporations fell within the jurisdiction of courts of equity from the nature of the case, the forms used in courts of law not being adapted to such controversies; and we accordingly find that it was the constant practice of the Court of Chancery to entertain suits for that purpose, and by its decree to determine who were stockholders and contributors, and in what proportions they were to contribute, and to cause an account to be taken of the unsatis-

fied debts and liabilities, and to decree a distribution according. *Slee* v. *Bloom* ( 19 *Johns.*, 456 ) and *Briggs* v. *Penniman* ( 8 *Cow.*, 387 ) are examples of suits of that character, and the jurisdiction was afterwards, and before the adoption of the constitution, regulated by statute. ( *R. S.*, 464, § 39, *et seq.*) It is very plain, therefore, that this is not a case in which the stockholders, who are sought to be charged, had a constitutional right to a trial by jury.

Another and more difficult question arises upon the provisions of the act for ascertaining the debts due from the insolvent corporations, with which the stockholders are to be charged. Upon one construction of the act, the account of debts and liabilities of the bank is to be taken as conclusively established by the receiver upon an *ex parte* examination to be made by him, and the stockholders, who are obliged to pay them, are deprived of any opportunity of appearing or contesting upon that question; and the aggregate of the debts so established is to be apportioned by the refereee among the stockholders, in proportion to their respective shares of the stock, and judgment is eventually to be rendered according to the apportionment, after it has been revised and confirmed by the court. Thus, it is argued, the amount of the burdens which is thrown upon the stockholders — which is, in its nature, a judicial question — is conclusively determined in a proceeding not judicial in its nature, and by a person who is not a judicial officer, and by a process which precludes all litigation on the part of the persons who are to be charged. The argument, so far as it assumes that the receiver is to proceed *ex parte*, seems to be well founded; for I do not perceive that the creditors have any right to intervene or to be heard before him. He is, upon his own motion and in his own way, to take into his possession and administer the assets of the bank, and to make a dividend, and then, if any debts or liabilities remain unsatisfied, he is to render to a justice of the Supreme Court in the district "a particular account of said debts and lia-

bilities so remaining unsatisfied." He is also to report a list of the persons appearing to be or to have been stockholders (§§ 11 to 15.)

So far the stockholders are not to receive any notice, and are not allowed, so far as I can perceive, to appear or to be heard in the proceeding. But upon this report being received the justice is to refer it "to a referee, to be appointed by him, with directions, after giving notice to all persons concerned, to apportion the debts and liabilities of such corporation, &c., among the said stockholders ratably, in proportion to their stock, &c., and to report his proceedings to such justice, or some other justice of the Supreme Court in the same district." (§ 16.)

The argument on the part of the stockholders assumes that the amount of the debts and liabilities which the receiver has reported is made conclusive upon the stockholders, and that the only duty of the referee is to ascertain and determine who the stockholders are who are to pay that amount, and the proportion to be paid by each. The order of reference in this case does not declare that the aggregate of the receiver's list of debts is to be apportioned, but, in the language of the statute, it directs the unpaid debts and liabilities to be apportioned, &c.

Upon mature reflection, I have come to the conclusion that the referee is to pass upon and determine the amount of the debts to be paid, as well as the parties who are to pay them, and that he is not obliged to take the receiver's statement of debts as conclusive. The language favors this construction. It is not the amount reported that the referee is directed to apportion, but the unsatisfied debts and liabilities of the bank. If it had been intended that the receiver's report of debts should form the basis of the apportionment, the section would have declared that the amount so reported should be divided. Again, we are not, in the absence of precise language, to intend that a matter so strictly judicial in its nature would be committed to a

person whose duties, in all other respects, relate to matters of administration. And, moreover, the act should, if practicable, be so construed that it should not violate any constitutional provision or any common principle of justice. Other parts of the act are consistent with the idea that the referee is himself to ascertain the amount of the debts. The eighteenth section requires the referee to hear the allegations and proofs of all parties and persons interested in the matter referred; and, besides ascertaining the persons chargeable as stockholders, he is to determine the amount chargeable to each. So the justice holding the special term is to hear the allegations of the parties and persons interested. If it were the intention of the act that the receiver's statement of debts should be conclusive, the further contest would be among the stockholders alone, and it would be natural that the act should designate them as the persons who are allowed to litigate before the referee and at the special term; instead of using general language, which fairly embraces the parties who are to receive, as well as those who are to pay, sums to be finally awarded. It is quite consistent with this view that the referee should take the receiver's list of creditors as presumptive evidence of the amount of the burthen to be apportioned among the stockholders, subject to be modified by the proofs and allegations of the stockholders or the creditors.

The receiver is authorized to adjust and settle the claims of creditors by mutual agreement, by amicable reference, or by suits before the courts, though he has no judicial authority. (*Act*, § 11; 2 *R. S.*, *p.* 41, § 7; *id.*, *p.* 468, § 73.) Hence his report would have a certain degree of authenticity, though it would not, in my opinion, be conclusive upon the stockholders. Certainly it would not conclude them, in respect to any debts not adjusted by the receiver, in one of the methods referred to.

It must unavoidably happen that an account of creditors, prepared immediately after the failure of the bank, would

be more or less imperfect.    Suppose additional debts to be discovered while a reference is pending, or the payment of debts reported to be ascertained : is the referee to refuse to hear the proof of this, and is he compelled to apportion the sum reported by the receiver, however erroneous it may be? We are bound to assume, if the terms of the act will allow it, that the legislature designed to provide a just and practical system of dealing with the estates of insolvent banks,— one which might ·be successfully worked out in practice, and which should violate no principle of constitutional law. I am satisfied that the construction which I have pointed out is the only one which will fulfill these conditions, and that it is warranted by the language which the legislature has employed.

The referee's report is to be made to a special term, before which, as we have seen, all the parties interested have a right to appear and contest its conclusions, and to appeal This, in my opinion, may be considered due process of law, within the meaning of the constitution.    The proceedings, it is true, are summary ; but it is within the discretion of the legislature, in a case in which a trial by jury is not required, to determine whether a controversy, judicial in its character, shall be pursued by a regular action or by a summary proceeding.    It has always assumed to prescribe the jurisdiction of the courts, and to regulate the proceedings at law and in equity ; and this right is expressly reserved by the constitution.    (*Art.* 6, § 5.)

The provision for giving notice was relied on by the counsel for the stockholders as evidence that the proceeding was not due process of law.    The notice of hearing before the referee is to be personal; or by service at the residence of the party, as to the stockholders who live in the county where the bank was located, and by advertisement in the state paper and in newspapers in the county as to all other stockholders.    (§ 17.)    It may therefore happen that some of the persons who are made liable will not have received

actual notice, and the question is, whether personal service of process, or actual notice to the party, is essential to constitute due process of law.

We have not been referred to any adjudications, holding that no man's right of property can be affected by a judicial proceeding unless he have personal notice. It may be admitted that a statute which should authorize any debt or damages to be adjudged against a person upon a purely *ex parte* proceeding, without a pretence of notice or any provision for defending, would be a violation of the constitution, and be void; but where the legislature has prescribed a kind of notice by which it is reasonably probable that the party proceeded against will be apprised of what is going on against him, and an opportunity is afforded him to defend, I am of opinion that the courts have not the power to pronounce the proceeding illegal. The legislature has uniformly acted upon that understanding of the constitution. Thus, attachments are allowed against parties represented to be absent, absconding or concealed debtors, and the proceeding results in the sale of their property and the appropriation of its avails to the benefit of the alleged creditors; and the only notice required is a publication in certain newspapers. (2 *R. S.*, 3, §§ 1, 28.) So in justices' courts, attachments are authorized against persons who have departed or are about to depart from the county, or who keep concealed, with a certain intent; and the notice required is the leaving the attachment at the last place of residence of the party, if such place exists, or, if not, with the person in whose possession the goods may be found. (2 *R. S.*, 230, §§ 26, 31.) There are many other examples of the same kind, such as foreclosing mortgages by advertisement; discharging an insolvent debtor upon the petition of a portion of his creditors, those not petitioning being notified of the proceeding only by advertisement in the newspapers. Various prudential regulations are made with respect to these remedies; but it may possibly happen, not-

withstanding all these precautions, that a citizen who owes nothing, and has done none of the acts mentioned in the statutes, may be deprived of his estate without any actual knowledge of the process by which it has been taken from him. If we hold, as we must, in order to sustain this legislation, that the constitution does not positively require personal notice in order to constitute a legal proceeding due process of law, it then belongs to the legislature to determine in the particular instance whether the case calls for this kind of exceptional legislation, and what manner of constructive notice shall be sufficient to reasonably apprise the party proceeded against of the legal steps which are taken against him. A case may be supposed where the reason for departing from the more safe rule of the common law is so plainly frivolous, or the provision for notice is so clearly colorable and illusory, that the courts would be called upon to declare the enactment a fraud upon the constitution.

The Supreme Court of the United States has several times pronounced state laws, professing only to *regulate* legal proceedings, to be unconstitutional, as impairing the obligation of contracts, though that court admits to the fullest extent the jurisdiction of the state legislature over legal remedies. (*Morse* v. *Goold*, 1 *Kern.*, 281, *and cases cited.*)

In the case under consideration, there was at least a plausible reason for not requiring actual notice. The shareholders in banking associations are frequently very numerous, and although the books ought to disclose their names, such is not always the case. Every one in any way connected with a bank would be likely to hear of a fact so notorious as that it had stopped payment, and that its affairs had passed into the hands of a receiver. If, then, all of the parties sought to be charged who reside in the same town are actually notified, and public notice is given in several public journals in regard to all others, the parties interested

will be likely to hear of the proceeding. The probability of actual knowledge would be equally great in respect to the creditors; as the holders of the liabilities of a bank are usually among the most likely to know that it has failed. I conclude, therefore, that the proceeding does not lose the character of legal process, within the constitutional provision, by the omission to require personal notice to be given to all the parties to be charged as stockholders.

There is no valid objection to the forum. The special term of the Supreme Court is a constitutional tribunal; and although the decision is to be made in the first instance by a referee, this is no more than is done in a large class of regular actions which are prosecuted in that court. The stockholders cannot complain that they have not a sufficient opportunity to review the determination of the referee,; for, as has been mentioned, they are not only entitled to be heard upon the confirmation of his report, but to appeal from the judgment to the general term of the Supreme Court, and to this court.

There are some other objections arising out of the provisions of the constitution, as to which very little requires to be said. It is objected that corporations cannot be proceeded against except by regular suit; for which position section 3 of article 8 is relied on, which declares that corporations shall have the right to sue and shall be subject to be sued in all courts, in like cases as natural persons. This is an enabling and not a restrictive provision; and it permits corporations to be parties to suits in justices' courts, contrary to the rule which formerly prevailed; but the provision has no bearing upon the statute for winding up insolvent corporations. It has sometimes been maintained, though not, I think, by the counsel in this case, that the act is in conflict with the very provision of the constitution rendering the stockholders liable for the debts, though it professes in terms to be an act to enforce these liabilities. The argument for this is, that the liability of the stock-

holders cannot be enforced in any other manner than in that provided by the act (§ 1), and that a remedy is not afforded in all cases; because, by section 7, proceedings can only be instituted by a creditor having a demand to the amount of $100 or more. This argument might probably be satisfactorily answered by the maxim *de minimis non curat lex;* but by referring to section 6, it will be seen that the proceeding may be instituted by any creditor who has obtained judgment and execution against the bank for any amount, upon proof that the debt cannot be collected by execution. Finally, it is argued by one of the counsel in this case, that the section of the constitution imposing the liability upon the stockholders is limited to the capital stock paid in, or agreed to be paid in, and does not require the contribution of a further amount, equal to the stock held by each shareholder. This would give the public no security, beyond what they had under existing laws; for the assets of the corporation, and any unpaid subscriptions to its stock, were always liable to its' creditors. That is the ordinary liability of the corporation. The constitution adds the individual responsibility of the stockholders; and the measure of that liability is the amount, or, as it would be better expressed, a sum equal to the amount of their respective shares of stock. This construction had been given by the court to similar language before the adoption of the constitution. (*Briggs* v. *Penniman, supra; Bank of Poughkeepsie* v. *Ibbotson,* 24 *Wend.,* 473.)

The statute not being subject to any constitutional objection, and the special term having acquired jurisdiction of the case, we are next to inquire whether there was a discontinuance which would render the subsequent proceedings void for want of continuing jurisdiction.

The referee is required to report to the first special term, after the expiration of six weeks from his appointment. (§ 18.)

On the 29th day of October, 1855, and during the sitting of the special term at which, by this provision, he was

bound to report, a justice of the Supreme Court made an order staying proceedings for six months from its date; and before the expiration of that time another justice made a similar order, dated April 28th, 1856, for a further period of six months from that time. These orders suspended all proceedings before the referee to the 29th of October, 1856. The orders were severally made upon the application of creditors and stockholders, who stated on oath that litigations between the receiver and debtors and creditors of the bank were pending, which would affect the amount which the stockholders would have to pay, and, according to the belief of the applicants, would wholly prevent the necessity of an assessment against them. By section 23 of the act, the apportionment may be suspended, for such a cause, not exceeding one year. These orders were therefore warranted by the act. It was said by the counsel for the receiver, and not denied on the other side, that there was no special term sitting on the twenty-ninth of October, and that none was held until the ensuing December. At the December term the referee represented that he had not completed his report, and could not do so within the time allowed by the statute. A further order was therefore granted on the sixteenth of that month, giving the receiver ninety days from its date to complete the apportionment and report it to the court. Before that period had fully expired the report was presented and filed. From this statement it will appear that there was no default on the part of the referee, when he applied for the last mentioned order ; and section 18 declares that if, in the opinion of the justice, further time is required to enable the referee to com plete the apportionment, he may allow such time, not exceeding ninety days. All these orders appear, therefore, to have been in conformity with the act. It is true that somewhat more than one year and ninety days elapsed be tween the time the report would have been due, if no order had been made, and the time when it was presented ; but it

was owing to the accidental circumstance that the court was not in session when the last six months' order expired. The order giving time to the referee, on his own account, could only be made by a justice, at a special term. He had a right to make an order for the whole period of ninety days, if the circumstances in his judgment required it, though a delay had already occurred in waiting for the sitting of a special term.

It should not be inferred, because we have taken pains to show that no laches on the part of the referee occurred, that, if such were the case, the future proceedings would be void. Upon the order of reference being made, the Supreme Court became possessed of the case, and a neglect on the part of the referee would no more put the parties out of court, than the omission of a referee, in an ordinary action, to make his report in time, would have that effect. But if the proceeding should be regarded as not taking place in a court of general jurisdiction, but should be assimilated to a special proceeding before an inferior magistrate, we still think the time fixed for the performance of intermediate steps, after jurisdiction had been once acquired, should be regarded as directory merely, and that an omission to perform one or more of them in time would not render the whole proceeding abortive. The primary order, which in the case supposed would be valid, divests the corporation of its property, and appoints a trustee to administer it. So the order by which the proceeding against the stockholders was commenced was unobjectionable. For the purpose of expediting the further proceedings and preventing delay, certain periods are fixed for the subsequent steps. The law in these respects ought to be observed; if, however, a slip happens to occur, it does not render the whole process a nullity, but the officer or party delinquent should be made to respond, according to the nature and consequences of his fault.

Certain of the stockholders objected, upon the motion to confirm the report, that several sums, embracing an item of

$59,851.40, had been included in the aggregate amount charged upon the stockholders, the same not being, as the objectors insisted, a valid and subsisting debt against the bank. This amount is mentioned in the receiver's report, and in the schedule of debts annexed to it, as debts claimed by the alleged creditors, who, however, are not named; but it is added that it had not been allowed by the receiver, but that notice had been given to him that it would be litigated. On looking through the testimony reported by the referee, it does not appear that any proof was offered respecting it, and, indeed, it is not mentioned in these proceedings; but it is included in the sum of $140,889.81, apportioned among and required to be paid by the stockholders.

I infer from the language of the report that the referee considered it his duty to take the amount reported by the receiver as the aggregate of the unpaid debts of the bank, without any authority on his part to pass any judgment upon it. I have already stated my views in respect to the jurisdiction of the referee in this particular. But if it be conceded that the receiver's determination as to the debts is conclusive, his report shows that he has not allowed this amount as a part of the debts of the bank. He treats it as a subject of litigation between the creditors claiming it and the trust estate in his hands. Surely this is not an authority for giving judgment for it against the stockholders without further investigation.

The receiver's report stated, with sufficient particularity, a large amount of indebtedness, besides the disputed amount. This was sufficient to carry the case to the referee. It was not improper for him to state the amount claimed, but not allowed by him; though such statement was not required by the statute. According to my view, it was the business of the creditors, concerned in the claims which the receiver had refused to recognize, to attend to their interests before the referee, and upon the motion to confirm the report, if they would insist upon their remedy against the stockholders.

In the absence of any testimony respecting the claims and with the receiver's report respecting them before him the referee was not authorized to charge them upon the stockholders. In the opinion of the special term it is said that no injury can eventually happen to the stockholders by the allowance of this sum, as they will be finally reimbursed under section 24; and section 23 declares that neither the making of a dividend, nor the making of an apportionment among the stockholders, is to be delayed beyond one year on account of litigations instituted to establish debts, but the proportion which would be due to a party seeking to establish a claim against the bank is to be retained, to be subsequently applied according to the event of the prosecution. But the act cannot be so construed as that money shall be collected from the stockholders on account of alleged debts simply claimed, but not in any manner established or allowed. Hence I am of opinion that the special term of the Supreme Court, instead of confirming the report, should have referred the same back to the same or another referee for further proof. If this shall be done hereafter, it may be shown by the creditors, or by the receiver as their trustee, that a recovery has been had for the disputed claims; or, if no court has passed upon them, that they are well founded in fact. If no such proof shall be given, then the indebtedness which is undisputed, or which has been established, should be apportioned among the stockholders.

The foregoing observations dispose of the several general objections which have been taken to the report. But certain of the parties, charged as stockholders, appealed to the general term, on account of alleged erroneous decisions in respect to their particular case; and, as a further hearing before a referee will have to take place, it is proper for us to dispose of these further questions, some of which are of considerable practical importance.

1.  The United States Fire Insurance Company and several others appealed because they had been charged as stockholders in respect to stock standing in their names, but which, as they alleged and proved before the referee, they held only by way of hypothecation as security for money loaned.  The referee charged the debtors who had transferred the stock; but the special term reversed that determination, and made the apportionment against the parties in whose names it stood.  In regard to two of the persons thus charged, Struthers and Pearsall, the debts had been paid and the scrip returned to the borrowers; but the evidence tended to show that this occurred after the bank had stopped payment, and after these proceedings had been commenced.  It had never been re-transferred on the books of the bank.  It has been recently decided in this court, in a case under the general manufacturing act of 1811, but which was in other respects precisely like the present, that the creditor, to whom stock hypothecated had been transferred on the company's books, was the person to be charged under the liability clause contained in that act.  (*Roosevelt* v. *Brown*, 1 *Kern.*, 148.)  There is no legal distinction between the words "members of the company," used in the act of 1811, and the term "stockholders," employed in the constitution and the act of 1849.  But there are other parts of the last mentioned act which must be considered.  It is declared that the term "stockholder," as used in the act, "shall apply not only to such persons as appear by the books of the corporation or association to be such, but also to every equitable owner of stock, although the same may appear on such books in the name of another person." (§ 2.)  The persons who were stockholders when the debt was contracted are the ones to be charged; but this liability is shifted to the purchasers, where the stock is transferred on the books, *bona fide*, prior to a default in paying the debt. (§ 3.)  Banks are bound under a penalty to keep a list of their stockholders and a statement of the registered transfers, and to exhibit them

when required.   The books containing these lists and state-
ments are made presumptive evidence of their contents, but
the presumption may be repelled. (§ 4.)

The debts left unpaid, when the bank failed, were con-
tracted either while these parties held the stock or when it
was held by some former proprietors, so that no question
arises under that portion of the third section.   Nor does it
appear to me that making the books presumptive evidence,
with the qualifications mentioned, is material.   As to these
parties the books of this bank are true, for the transfers in
question were actually made, as there mentioned, with the
assent of the parties.   The presumption is not repelled, but
confirmed.   If the parties who complain can escape from
responsibility, it must be on the ground that the debtors
who hypothecated the stock are the equitable owners, within
the intention of the second section, and the parties to be
charged in exoneration of the creditors assessed by the
special term.

The legislature manifestly intended to enforce the consti-
tutional provision.   This is stated in terms in the title of
the act, and is apparent from its provisions.   We are not
at liberty to construe the second section in such a manner
as to exempt from liability any parties whom the constitu-
tion has made liable; but there is not the same objection
against holding that the statute comprehends others not
made liable by the constitution.   All those who are pro-
perly termed stockholders must contribute to the extent
declared by the constitution; and in addition to this the
legislature has power to include parties equitably interested
in the stock, but who were not actually stockholders.
Stockholders who have transferred their shares by way of
hypothecation certainly retain an equitable interest in them,
and hence are in some sense equitable owners; but the
parties to whom the stock was transferred, and in whose
name it is registered, are the stockholders.   This was de-
cided in a well-considered case in the former Supreme Court.

shortly before the constitution was adopted. (*Adderly* v. *Storm*, 6 *Hill*, 624.) And when the constitutional convention came to attach a liability to stockholders of banks, it may be fairly concluded that the term was used in the sense which the court had affixed to it. The act does not declare that persons appearing on the books of the corporation to be stockholders shall be exempt from liability when another person is the equitable owner. The enactment is, that the term stockholder is to apply, *not only* to those appearing by the books to be stockholders, *but also* to every equitable owner of stock standing in the name of another. If the referee had assessed both parties to the hypothecation, where the stock had been registered in the name of the lender of money, an argument of considerable force could be made in favor of the decision. The creditors of the bank would be more fully protected by having the responsibility of both parties; and the execution could be levied upon the borrower, who ought, in equity, as between himself and the lender, to be primarily charged, if he possessed property out of which the charge could be satisfied. But neither party has contended for that rule, and we have only to decide whether the lenders, to whom the stock had been transferred on the books, were legally chargeable. I am of opinion that they are fairly included in the constitutional provision, and that the legislature has not attempted to establish a different rule. If the statute does not admit of a joint judgment against both parties to an hypothecation, and if the party registered as a stockholder must be exonerated whenever an equitable owner of the same stock is charged, then I am of opinion that the provision charging the equitable owner should be limited to cases where the party who is registered as the owner is merely a nominal holder. A trustee, legally authorized to invest the funds of another in bank stock, but who had no personal interest, would be such a holder. So one whose name had been used as a transferee of stock without his consent; and so, I think,

of a holder by hypothecation for a debt, who had received payment, and given a power of attorney to re-transfer the stock before the failure of the bank. The person making the transfer is not the equitable owner in case of an hypothecation. He has, it is true, an equitable interest, but is not, in any proper sense, an owner. He can neither receive the dividends, vote upon the stock, nor compel a transfer to himself, while the debt remains unpaid. He has precisely the same interest which the purchaser of stock under an executory agreement, without a transfer and before paying the purchase price, would have; and yet no one would consider such a purchaser an owner in any sense, or suppose he could be assessed as a stockholder. On this part of the case I concur in opinion with the special term.

2. Other parties appealed to the general term, because, as they alleged, they had been charged in respect to stock standing in their names, but which they held as trustees for the bank itself. An effort appears to have been made by the directors to sustain the credit of the stock by becoming purchasers of it in the market. This was done in the name of one of their number, or in that of some person friendly to them. The note of the purchaser was taken by the bank, which then advanced the money for the stock to the seller, upon a discount of the purchaser's note, and the transfer was made to the individual purchaser. The plan was, that it should be so held until a real purchaser could be found, to whom it was then to be transferred. During this state of things the bank failed. It was in proof that the directors did not consider that they had a right to purchase stock in behalf of the bank, being advised that it was illegal. I am of opinion that the referee was right in charging the persons in whose name the stock stood as the contributors towards the debts. There was not, in fact, any trust in favor of the bank, if it had a right to traffic in its own stock. The most that can be said is, that the purchasers relied upon the directors, who controlled the bank, to carry on the debt contracted

by them until other *bona fide* purchasers could be found. They all expected that such a time would arrive; but while thus waiting the directors were deprived of their power, and the parties who assumed the risk of holding the stock must abide by the consequences.

3. Jonathan Purdy appealed, because, as he contended and attempted to prove, he was a creditor as well as a stockholder of the bank. He claimed to set off the indebtedness of the bank to him against his liability. Under the manufacturing act, and in some other corporations, a creditor might sue a single stockholder, who might set up, in reduction of his liability, that he was also a creditor. In such a case no account could be taken, and it would not regularly appear but that the plaintiff's debt was the only one existing against the corporation, nor could it be shown but that there were other stockholders who were not creditors, whose liabilities were sufficient to satisfy the plaintiff's debt. In such a case the defendant ought to be exonerated to the extent of his own debt. But under a proceeding for winding up a corporation, where an account of all the debts and of the effects, including the aggregate liabilities of the stockholders, is required to be taken, there is no reason why a creditor should be in any better situation on account of being at the same time a stockholder. In the latter character the constitution and the statute make him liable to the creditors to an amount equal to his stock, or to his just proportion of that amount if the whole is not required; but as a creditor he is entitled only to a dividend in proportion to the other creditors. In case of a deficiency in means to pay all the debts, he must take his dividend, *pro rata*. But if he could set off his claim as a creditor against his liability as a stockholder, he might be paid in full, while the other creditors would receive only a part of the amount due them. The rule on this subject was explained in *Garrison* v. *Howe* (17 *N. Y.*, 458). I have looked over the other instances in which errors are supposed to have been committed by the

referee and the special term, but do not find that any of the objections were well taken, except that I do not perceive any evidence to exonerate Claudius L. Monell, who appears on the stock ledger to be the holder of two hundred shares of stock, and was not assessed by the referee or by the justice at special term.

The judgment of the general term, which wholly discharged all parties who appealed to it, should be reversed. That judgment put an end to the proceeding upon grounds which, we think, cannot be sustained. But the judgment of the special term cannot be affirmed, because a large amount of assumed indebtedness was apportioned among the contributors which was not shown to exist, and because Mr. Monell, who, upon the evidence, appeared to be a stockholder, was not charged with his proportion of the indebtedness. The order to be entered here will be, that the judgments of the general and of the special terms be reversed, and that the proceedings be remitted to the Supreme Court, with directions to refer the report back, for further proof and examination, to the same or another referee, who must be ordered to report a new apportionment, and the further proof which he may take, within a time to be fixed by the court. From the time which has elapsed, it is quite probable that material changes may have taken place in the amount of assets in the receiver's hands, and further facts may have been ascertained in respect to the amount of the debts. As the stockholders ought to be charged with the full amount of the unsatisfied debts, over and above the cash on hand applicable to their payment, and no more, the receiver should be examined before the referee, with a view to have an accurate account taken. If a recovery has been had for the $59,851 40, which the receiver disallowed, or any part of it, or if it can be otherwise shown to be a valid liability of the bank, it ought still to be included in the sum to be apportioned among the stockholders. So if any other

debts are established, though not mentioned in the receiver's list, they are to be allowed by the referee.

Ordered accordingly