SANDS, receiver &c., *vs.* KIMBARK and others, executors &c.

The act of the legislature, of April 21, 1862, " to facilitate the closing up of insolvent and dissolved mutual insurance companies," is not unconstitutional and void, as impairing the right of trial by jury.

THIS proceeding was under the act entitled "An act to facilitate the closing up of insolvent and dissolved mutual insurance companies," passed April 21, 1862.

David Kimbark, the testator, on the 1st of April, 1851, made his note to the Ætna Insurance Company of Utica, for $360, payable at such time or times as the directors of said company might require, agreeably to their charter and by-laws. The company was both insolvent and dissolved. The plaintiff, its receiver, assessed the note to its full amount, to pay the liabilities of said company, and caused a personal demand of payment to be made of the maker's executors, who neglected payment, when the same was referred to Solomon Bundy, Esq. sole referee, upon application to Hon. William W. Campbell, a justice of this court residing in the district where the plaintiff, as receiver, keeps his office. As provided by the 2d section of the act, the referee proceeded in a summary manner to hear the proofs and allegations of the parties, upon written pleadings. Before answer and proceeding in the trial, the defendant objected to any proceedings being had therein, claiming that the act under and by virtue of which the referee was appointed was unconstitutional and void. The plaintiff proved that an assessment was made by him on the 14th June, 1862, by which the said note, being a note in the merchants' department, was assessed to its entire amount; that the 9th of August, 1862, was fixed for its payment; and that the notice of assessment was published as required by the charter and by-laws. The plaintiff further proved that the note was given for a policy of insurance for three years from its date, and that the losses for which said assessment was made amount to $33,792.59, and that said losses accrued whilst the policy was in force; that said losses were in the

same department of the testator's note and policy; and that all the notes of that department were insufficient to pay the losses of that department. The defendants admitted the note to have been executed by their testator as a premium note and not as a stock note; that a personal demand of payment was made; and that payment was neglected and refused before the commencement of this proceeding.

When the plaintiff rested the defendants moved for a nonsuit, on the grounds:

*First.* That the act under which the reference is had is unconstitutional and void, as impairing the right of trial by jury.

*Second.* That the claim in action is barred by the statute of limitations.

*Third.* That the assessments of the plaintiff are void as to the defendants, (1.) For the reason that the affidavit on which it is based shows no loss for which the testator's note is liable to contribute. (2.) That there is no proof any where of such losses. (3.) That the assessment is general, assessing all the notes of its class, and of all dates, to their full amount. (4.) That there is no legal proof of the occurrence of any losses for which any assessment could be made, nor for which the said note is liable to contribute. The referee decided,

*First.* That the act under which the reference is ordered is a valid act.

*Second.* That the statute of limitations forms no defense to this action, the note in action being a premium note.

*Third.* That the receiver's assessment of June 14th, 1862, being proved to be for losses which accrued in the merchants' department whilst the testator's note and policy in that department were in force, is a valid assessment.

*Fourth.* That the plaintiff is entitled to judgment for three hundred and sixty dollars, being the entire amount of said note with interest from September 13th, 1862, being the date of the demand of payment of said note, and of the neglect and refusal to pay the same.

The defendants excepted to each of said decisions.

The charter provided " that the notes be paid in whole or in part, and at such times as the directors shall deem the same requisite for the payment of losses and such incidental expenses as shall be necessary for transacting the business of the company." It further provided that " the company may in their discretion divide applications into two or more classes, according to the degree of hazard, and the premium notes shall not be assessed for the payment of any losses except in the class to which they belong."

The by-laws provided " that the directors may make such assessments upon the premium notes as they may think necessary."

The defendants appealed to the general term.

*Horace Packer,* for the appellants. I. The act of April 21, 1862, ch. 412, is unconstitutional and void. (*Const. art.* 1, *sec.* 2.) It takes away the right of trial by jury, in cases wherein it before existed. It has instituted a new court, which proceeds not according to the common law. (*Art.* 1, *sec.* 17.) These rights have always been guarded with great care by all judges and jurists. (3 *Bl. Com.* 380. 3 *Hamilton's Works,* 259, *No.* 83. 3 *Dallas,* 388.) The right of trial by jury applies to civil as well as criminal actions. (10 *Wend.* 449.) The tribunal below is nowhere provided for in the constitution. That instrument is clear as well as minute in this regard—too much so for any thing herein to the contrary to be taken by implication. The power of the legislature to create inferior courts is confined to *cities.* (*Art.* 6, *sec.* 14.) If a court of record, its proceedings, rules of practice, &c. should have been reported to the legislature by the commissioners of the code. (*Art.* 6, *sec.* 24.) The act is summary and arbitrary in its proceedings, such as were unknown in any of the courts. It takes away the defendant's day to plead. It deprives him of the right to apply for discovery on oath, that he may plead and defend understand-

ingly. Its proceedings are not according to the rules of law, nor the rules and practice in equity. The act under which the corporation was created, provided a remedy *in law* for all controversies that might arise in said company. The company ceased to exist about the time the defendants' testator's policy expired; and the rights of all parties became fixed by the laws as they then were. It is a *live* corporation whose charter may be altered. The courts never went further than to allow a reference in cases only where an issue of fact had been joined, or in interlocutory proceedings. (*Lee* v. *Tillotson,* 24 *Wend.* 337.)

II. The alleged cause of action did not accrue to the plaintiff within six (7) years next before its commencement; nor was the action commenced within one year next after the appointing of executors of deceased. At the expiration of his policy the said David Kimbark ceased to be a member of the company; and not having been a party, nor had any knowledge of the proceedings had by said company, he was not, nor are the defendants, bound by such proceedings, nor can his estate be prejudiced thereby. The first assessment was 21st March, 1855. At that time the note became payable. If the creditors have slept upon their rights, or been remiss, the rules of law should not be warped to save their lost rights.

III. The assessment of the 14th June, 1862, is unauthorized and illegal. The note was outlawed before the time of said assessment. There is no proof, as required, of losses. There was no proof at the time of any valid and subsisting claims against the company. The receiver is not liable over to the alleged creditors.

IV. If the act of April 17, 1854, chapter 369, has the force to bring the company in question under that act, and subject it, with other insolvent corporations under the general statutes, as claimed by the plaintiff, then the note in question should be abated so that it will be but five times the amount of the cash premium, to wit, $90. The other exceptions and objections taken and contained in the case and bill of excep-

tions, are not waived nor abandoned by the defendants, but are held to be good, and well taken.

*Henry R. Mygatt,* for the respondents. I. The act entitled "An act to facilitate the closing up of insolvent and dissolved mutual insurance companies," passed April 21, 1862, (*Laws of* 1862, *p.* 743,) is not unconstitutional.

(1.) Before the court will deem it their duty to declare an act of the legislature unconstitutional, a case must be presented in which there can be no rational doubt. (*Ex parte McCollum,* 1 *Cowen,* 450. *People* v. *Huntington,* 4 *N. Y. Leg. Obs.* 187. *Clarke* v. *City of Rochester,* 24 *Barb.* 446.)

(2.) It is not in conflict with section 2 of article 1 of the constitution of this state, which declares that "The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." (*Const. of* 1777, § 41. *Same provision of Const. of* 1822, *art.* 7, § 2. *Same provision Const. of* 1846, *art.* 1, § 2.) That section gives a right of trial by jury only in cases where it had been *theretofore* used. The word heretofore in this clause in the constitution of 1846, means before 1846, and cannot, to limit its meaning, be carried back to and confined to the cases which at that earlier period were triable by jury. (*Wynehamer* v. *People,* 13 *N. Y. Rep.* 378, 427, 458.) Denio, J. in delivering the opinion of the court says : " In controversies cognizable in courts of equity, a jury trial was never in general resorted to. The facts were determined by the court, or its officers, *or by referees.* Particular issues might be ordered for trial by a jury, but this was discretionary except in a few cases where there were particular statutory provisions. *The winding up and settling of the affairs of insolvent corporations fell within the jurisdiction of courts of equity* from the nature of *the case.* (*Matter of the Empire City Bank,* 18 *N. Y. Rep.* 199, 210.) The Supreme Court in New York, by Mitchell, J. : " It is objected that a corporation can be dissolved only by *quo warranto* or an action

under the code of like effect. *The legislature may alter the form of remedies as it pleases. The provisions of the constitution as to trial by jury*, do not apply, as this is a proceeding on account of *insolvency*, which has been generally prosecuted in a summary way or before the court of chancery." (*Case of the Mechanics' Fire Ins. Co.* 5 *Abbott's Pr.* 444.)

(3.) Proceedings of the like nature to the act in question, were the laws of the land prior to the constitution of 1822, as well as under the revised statutes of 1830, and so continue until this time. *Edwards on Referees*, page 1, in regard to the constitutionality of references, says : " It has been made a point that a reference is unconstitutional from the fact that a party has a right to a trial by jury ; but previous to the adoption of the state constitution, references were known and sanctioned."

By the revised laws of 1813 " all matters and accounts between such absconding and concealed debtor and his debtors or creditors," his trustees were authorized to settle. (1 *R. L.* 1813, *p.* 161, § 15.) And referees were nominated and appointed for that purpose. (*Id.* 161, § 16.) The supreme court in 1840, by Cowen, J. said : " But the seventh article (§ 2) of our own constitution declares that, ' the trial by jury in all cases in which it has been heretofore used shall remain inviolate for ever,' and the case before us is supposed not to come within the exception. It is a satisfactory answer, however, that references as broad as that now contended for by the plaintiff were sanctioned by statute, and practiced by the courts long before the adoption of the constitution." (*Lee* v. *Tillotson*, 24 *Wend.* 337.)

(4.) The reference of claims due insurance companies is authorized in the same manner and by the same statute, as the reference of all claims due to or from any bank or other insolvent corporations. *First.* The term moneyed corporations applies the same to insurance companies as to banks. " The term 'moneyed corporation,' as used in this title,

shall be construed to mean every corporation having banking powers, or authorized by law to make insurances." (1 *R. S.* 599, § 51. 2 *id. 5th ed.* 526, § 54.) *Second.* Equity proceedings against insurance companies are the same as against banks. The statute declares that, "whenever any corporation having banking powers or *authorized by law to make insurances,* shall become insolvent," the same shall be restrained from exercising any of its corporate rights, privileges or franchises. (2 *R. S.* 464, § 39. 3 *id. 5th ed.* 764, § 47.) *Third.* The revised statutes declare that "such receivers," (referring to receivers of insolvent corporations,) "shall have the power to settle any controversy that shall arise between them and any *debtors or creditors* of such corporations *by a reference,* as is by law given to the *trustees of insolvent debtors.*" (2 *R. S.* 470, § 80. 3 *id. 5th ed.* 770, § 54.) And the same proceedings for that purpose shall be had, and with the like effect. (*Id.*) *Fourth.* "If any controversy shall arise between the trustees [of an insolvent debtor] and any other person, in the settlement of any demands against such debtor or of debts due to his estate, the same may be referred to three indifferent persons" to be agreed upon. (2 *R. S.* 45, §19. 3 *id. 5th ed.* 118, § 21.) If said referees are not selected by agreement then they are to be appointed on ten days' notice to the officer making the appointment of said trustees. (2. *R. S.* 45, § 20. 3 *id. 5th ed.* 118, § 22.) *Fifth.* By the act in question the reference is retained and the sole referee is adopted. The act assimilates to the sections of the act directing compulsory references in controversies with the trustees of insolvent debtors.

II. The statute of limitations has no application to this note, the payment of which was not demanded until the day of the commencement of this proceeding.

III. The assessment is valid. It is upon a note in the merchants' department, to pay the losses of that department only; the losses during the existence of the appellant's note

and the policy accompanying the same, were more than the valid notes of that department during that term.

IV. It is no objection to the respondent's recovery that the appellant's testator's note was given for more than five times the amount of the premium paid in cash. The restraining act was of June 25, 1853, and this note was long before that date.

*By the Court*, CAMPBELL, J. This action was brought against the defendants as executors, by the plaintiff, as receiver of a mutual insurance company, and was referred to a referee, pursuant to the act of April 21st, 1862, passed to " facilitate the closing up of insolvent and dissolved mutual insurance companies." On the hearing before the referee, the defendants objected that the act under which the reference was ordered was unconstitutional and void, as impairing or taking away the right of trial by jury. The referee decided that the act was valid and constitutional, and this raises the important question in this case.

A quaint old writer in an article entitled " a guide to juries," printed in the " Conductor Generalis," published in the city of New York in 1749, after remarking among other things that that " is the best law which leaves the least to the arbitrariness of a judge," and that " judges represent the king's person ; they are his officers and act in his stead," concludes, (citing Bracton, 119,) " they ought not at all be concerned in causes of life or member, &c. where the king is a party, for says he, " the king is thus judge as it were in his own cause." And he further remarks, " thus appears what is the difference of judges and juries and something of the reason why the parliament has all along been so zealous for trials by juries, as no fewer than *fifty-eight* several times since the *Norman* conquest hath established and confirmed the trial by juries, no one privilege else, nigh so often remembered in parliament."

This work, as I have stated, was published in New York

in 1749, though it had been written in England. It was adapted to the practice in New York, especially in proceedings before justices and courts of sessions, and the article on juries had a peculiar significance at that period. There had been noted instances where an independent jury had stood between the court and the prisoner. A short time previous had occurred a memorable trial, that of Zenger, during the administration of Gov. Cosby, when by an arbitrary order the counsel of the prisoner was thrown over the bar, and all the power of the court and the government was brought to bear to insure a conviction. The jury however, in defiance of power, acquitted the prisoner. So at a still earlier day, during the reign of Queen Ann, where a dissenting minister was indicted for preaching without the queen's license, an independent jury, in opposition to the charge of the court, returned a verdict of not guilty. There were also violent conflicts between several of the royal governors and the people of the colony of New York in reference to the establishment of a court of chancery. It continued with more or less severity for nearly a century, and its complete history would form an interesting chapter in the annals of our colonial jurisprudence. The objection to the court was mainly however founded in political considerations. For a considerable portion of the time, the governor and council formed the court of chancery. Towards the close of our colonial existence the governor alone was chancellor. That court at times exercised powers at least very questionable. Thus, during governor Hunter's administration, he writes to the lords of trade, in 1712, that for some years no quit-rents had been paid, and that by advice of the chief justice and others, learned in the law, he had issued writs out of the court of chancery for the purpose of enforcing collection, and he adds, " it appeared a combination by their own confession, several having owned that they were resolved never more to pay any, relying upon the sense and strength of a county jury, if they should at any time be sued for the same." In 1717, the same governor

wrote to the lords of trade as follows: that soon after his arrival " the receiver general complained that there was a total cessation of payment of quit-rents, and begged for a remedy, he hoped for none in the common course of law, the delinquents not only trusting to, but bragging of the impossibility of finding juries in the country that would give a verdict for the crown, if left to a jury, upon which the delinquents were subpœnaed to the court of chancery, *which immediately had its effect.*"

Though the governor still continued as chancellor, the court of chancery at the close of our colonial existence had become firmly established. Thus Governor Tryon, the last of the royal governors, in June, 1774, thus refers to it : " The province has a court of chancery in which the governor or commander-in-chief sits as chancellor, and the practice of the court of chancery of England is pursued as closely as possible. The officers of this court consist of a master of the rolls, newly created, two masters, two clerks in court, a register, an examiner, and a sergeant at arms." Thus it will be seen that the court, with the exception of a master of the rolls, had the same general organization before as after the revolution, and which with but unimportant changes remained down to the time of the adoption of the constitution of 1846. The same was true of the supreme court and the old court of common pleas, especially as to the former, down to 1821.

The supreme court, in colonial times, claimed to exercise and was admitted to possess all the powers of the English courts of king's bench, exchequer and common pleas. From this glance at the courts before the revolution, we may perhaps be in some degree better enabled to understand that provision in the constitution of 1777, relating to the trial by jury. That constitution it is understood was almost if not entirely the production of the pen of John Jay. Though other able lawyers and illustrious statesmen were also members of the convention. The 41st section is as follows: "And this convention doth further ordain, determine and declare, in

the name and by the authority of the good people of this state, *that trial by jury in all cases in which it hath heretofore been used in the colony of New-York,* shall be established and remain inviolate forever, and that no acts of attainder shall be passed by the legislature of this state for crimes other than those committed before the termination of the present war, and that such acts shall not work corruption of blood; and further that the legislature of this state shall at no time hereafter institute any new court or courts but such as shall proceed according to the *course of the common law.*"

The constitution of 1777 was not submitted to the people for ratification. The convention was clothed with full powers to make the constitution, and so far as I am aware, no record was preserved of the debates, if any, which were had at the time of its adoption by the convention. But though the language of the section is broad enough to cover trials both in civil and criminal cases, yet from the context I am strongly inclined to think that the framers of that constitution had special reference to trials by jury in criminal matters. No acts of attainder were to be passed and no new courts established, which should not proceed according to the course of the common law—that is, no star chamber court or court of that character and form of proceeding. The court of chancery, a court which did not in all things proceed according to the course of the common law, but which in some of its forms and maxims followed the civil law, was preserved by this same constitution in full force and vigor. The royal governor was no longer to be chancellor, but this judicial officer was to be appointed from among the people by the governor whom the people should elect. The great object undoubtedly was to preserve to the citizen of the new state, what may have been his right and his boast when an English subject. "The trial by jury in criminal cases is more peculiarly the grand bulwark of the liberties of every subject, and is secured as has already been mentioned, by the great charter, 9 Henry 3." (*Jacob's Law Dict. tit. Jury.*) The language of the section

of the great charter referred to is, "No freeman shall be taken or imprisoned or be disseized of his freedom or liberties or free customs, or be outlawed or exiled or any otherwise destroyed, nor we will *not pass upon him nor condemn him but by lawful judgment of his peers,* or by the law of the land." This becomes more obvious when we see with what unswerving fidelity on the part of all branches of the government, and especially by the judiciary, the right to trial by jury in criminal cases has been maintained, even holding that the prisoner could not by consent, as in Cancemi's case, be convicted by less than twelve men. On the other hand, there has been frittering away by legislatures and courts in civil cases, limiting the application of the constitutional inhibition in civil cases to proceedings where an issue was formed, and holding as valid and constitutional enactments under which by assessments and appraisals of commissioners and others, the property of individuals was taken for the use of the state or for corporations. In the convention of 1821, many members doubted whether it was wise to incorporate in the constitution what might properly be termed a bill of rights. So far as the civil administration of justice is concerned, there can hardly, I think, be a doubt that it is safe enough to leave it to be regulated by the legislature.

But assuming that the provisions in the constitutions of 1777 and 1821, have reference to trials in civil as well as in criminal cases, and which I admit is the fair construction of the terms, and has received the sanction of our courts; admitting this, does the case before us fall within the exceptions which have been recognized; in other words, is it not a proceeding or trial as "heretofore used," without a jury? Does it properly fall, as claimed by the counsel for the plaintiff, within the equitable jurisdiction of the supreme court exercising the powers of a court of chancery? Dissolving copartnerships and moneyed and other corporations, whether banks or insurance or manufacturing companies, appointing receivers, and regulating the collection and distribution of their

assets, is a well regulated branch of equity jurisdiction. It belongs to a class of cases coming under the head of implied trusts.

." A court of common law," says Mr. Justice Story, in his Equity Jurisprudence, § 1252, " is incapable of administering any just relief, since it has no power of bringing all the proper parties before the court, or of ascertaining the full amount of the debts, the mode of contribution, the number of contributors, or the cross equities and liabilities which may be absolutely required for a proper adjustment of the rights of all parties as well as the creditors." And in the *Matter of the Empire City Bank,* (18 *N. Y. Rep.* 210,) Judge Denio states the doctrine clearly and concisely, that the winding up and settling the affairs of insolvent corporations from the very nature of the case, fell within the jurisdiction of a court of equity, and that it was the constant practice of a court of chancery, " to entertain suits for that purpose, and by its decree determine who were stockholders and contributors, and in what proportions they were to contribute, and to cause an account to be taken of the unsatisfied debts and liabilities, and to decree a distribution," citing *Slee* v. *Bloom,* (19 *John.* 456,) and *Briggs* v. *Penniman,* (8 *Cowen,* 387.) The first of these cases grew out of the winding up of a manufacturing company, and a decree was made on the first hearing in the court of errors directly against a portion of the stockholders, for the payment of balances due upon their stock, or in proportion sufficient to pay the plaintiff's debt, and as to other stockholders who claimed set-offs, the matter in controversy to be determined by a master in chancery. *Briggs* v. *Penniman* was also an action for dissolving a manufacturing corporation. The court of chancery decreed the corporation dissolved, and that the stockholders were liable for the debts to the extent of their respective shares, and referred it to a master to report the amount of debts and the proportions chargeable to the stockholders. This decree was affirmed in the court for the correction of errors, and in that court Spencer, senator, thus tersely states the doctrine which applies in

this case. " The stock subscribed and agreed to be paid into the company became corporate property, and when paid in, might be reached by ordinary proceedings, and if not paid in, a court of equity would compel the trustees to collect and apply it to the payment of debts." (*Salmon* v. *The Hamborough Company,* 1 *Cas. Ch.* 204. 1 *Kyd on Corp.* 273.) The same principle was acted upon in the case of *Slee* v. *Bloom,* in which the stockholders were required in the first instance to pay up the amount of their subscriptions for the benefit of the creditors.

Now in the case of these mutual insurance companies, every person taking out an insurance and giving his note to the company, becomes a member liable to contribute under certain contingencies for the payment of debts, the whole amount of his note. His case is analogous to that of a stockholder in other corporations who had paid in a portion of his subscription, and was liable to be called upon to pay in the balance if the exigencies of the corporation should require it. In both cases the subject matter falls alike within the jurisdiction of a court of equity. In the one case, the stockholder may not be required to pay in the whole balance of his subscription, and the member of the mutual insurance company may be called on to pay an assessment less than the amount of his note. The doctrine of contribution is applicable in both cases, and I am unable to see why this receiver could not on the equity side of this court, representing as he does both the insolvent and the dissolved corporation and its creditors, have commenced an action making all the members whose notes remained unpaid, and who were liable to contribution, parties defendants. It might be and doubtless would be a very unwieldy action, but I apprehend it would not be contended by the defendants, that they were of right entitled to a trial by jury. I think the law well settled the other way, not only by the cases in our own courts, but by numerous decisions in other states, and in England; that is, that the whole matter falls within the jurisdiction of a court of equity.

The law of 1862 does not, therefore, confer or attempt to confer any new equity jurisdiction. It does not seek to transfer a subject matter which was previously only cognizable in a common law court over to a court of equity, and thus deprive a party of a trial by jury. Its aim is to point out and authorize a new and more speedy and inexpensive mode of disposing of the controversies which may arise, between the receiver and the members of a company in relation to their liability to contribute, and the amount of such contribution where the liability is conceded or established. The subject matters remain as before, but a more expeditious remedy is given. The equities are to be worked out by a somewhat different process. There is no longer necessity for an unwieldy action embracing all the members as parties.

When the motion for appointing a referee was argued before me at special term, by the able and ingenious counsel for the members of this insolvent company of which the plaintiff is receiver, I had at first grave doubts as to the constitutionality of the law of 1862. But subsequent examination and reflection have satisfied me that my original impressions were erroneous. Other reasons than those given might be stated; especially the proceedings in cases of the insolvency of individuals, might be referred to, as showing compulsory references prior to the constitution of 1846. But for the reason that the whole subject matter of the dissolving these companies and appointing receivers, and collecting and distributing the proceeds and payment of debts, was formerly and is still within the jurisdiction of a court of equity, in which court the matters in controversy were generally settled without a jury, and that the law of 1862 confers no new jurisdiction, but only authorizes a more expeditious and less expensive remedy, I am of opinion that such law is not unconstitutional.

The other points in this case have been heretofore disposed of. The judgment must be affirmed with costs.

[BROOME GENERAL TERM, January 27, 1863. *Balcom, Campbell* and *Mason*, Justices.]