(35 App. Div. 546.)

### GOODRICH v. SANDERSON et al.

(Supreme Court, Appellate Division, First Department. December 16, 1898.)

1. LEASE—COVENANT FOR QUIET ENJOYMENT—BREACH.
   A covenant in a lease for quiet enjoyment, without hindrance from the landlord "or any person whomsoever," is not broken by the intrusion of any other person than the landlord, those acting under him, or some one having paramount title to his.

2. ACCORD AND SATISFACTION—WHAT CONSTITUTES.
   There was a claim for rent and an unliquidated claim by the tenants for reimbursement for interference with their possession, which was adjusted at a fixed sum, and a payment of the balance. *Held*, that it was a valid accord and satisfaction.

3. SAME—DISPUTE.
   On the first of the month, the landlord demanded rent, and his attention was called to a claim of the tenants for credits, as a ground for refusal to pay until adjustment. On the 18th he wrote, reminding the tenants that the month was more than half gone, and that the amount of deduction had been agreed on. In the meanwhile he had threatened to sue. *Held*, that there was a dispute supporting an accord and satisfaction.

4. SAME—UNLIQUIDATED DEMAND.
   Where an account is unliquidated, the fact that it is allowed in full against an opposing claim does not preclude an accord and satisfaction.

5. SAME—COMPROMISE.
   A compromise is not a prerequisite of an accord and satisfaction.

**6. SAME—PAYMENT.**

　　The fact that on settlement of an opposing claim a balance was agreed on and paid, instead of each paying the gross amount of his debt, does not prevent its being an accord and satisfaction.

**7. SAME—UNTENABLE CLAIMS.**

　　An accord and satisfaction may be founded on an untenable claim if it be not illegal.

**8. RECEIVERS—POWERS.**

　　An ancillary receiver of a foreign corporation was appointed, "with the usual powers and duties of receivers according to the laws of the state and practice of court." 2 Rev. St. p. 469, § 68, gives the receiver of a corporation appointed on its voluntary dissolution the powers of trustees of insolvent debtors. *Held* that, except so far as limited by the fact that his appointment was ancillary, the order conferred on him the powers of trustees of insolvent debtors, as defined on page 41, § 7, subdivision 8 of which authorizes him to settle all accounts between such debtor and his debtors or creditors; and hence he was authorized to effect a settlement with tenants of the corporation by allowing them their claim in full for reimbursement for interference with their possession.

Appeal from judgment on report of referee.

Action by William W. Goodrich, as receiver of the Union Warehouse Company, against Oswald Sanderson, impleaded with Harold A. Sanderson. There was a judgment for defendant Oswald Sanderson, and plaintiff appeals. Affirmed.

The following is the opinion of the referee (MAN, R.):

The plaintiff is the receiver of the Union Warehouse Company, a corporation organized under the laws of the state of New Jersey. He was appointed such receiver for the state of New York on June 8, 1894, a receiver having theretofore been appointed by the court of chancery in New Jersey. The order of appointment conferred upon him the usual powers of receivers according to the laws of the state of New York and the practice of the supreme court, and also power to continue the business of the corporation until the further order of the court. At the time of his appointment, the Union Warehouse Company held by assignment from E. B. Bartlett & Co., dated January 8, 1892, a lease from the executors of one Prentice to Bartlett & Co. of certain warehouses, bulkhead, and piers in Brooklyn. Bartlett & Co. had sublet to the defendants in this action three piers and part of the bulkhead by a written lease, upon which the present action is brought. Said sublease had also been assigned by Bartlett & Co. to the Union Warehouse Company. Both the principal lease and the sublease contained covenants of quiet enjoyment of the respective demised premises, "without let, suit, trouble, or hindrance of or from the parties of the first part (the landlords), or any other person or persons whomsoever." The principal lease contained a covenant on the part of the tenant to keep the demised premises in good order and repair, "except as hereinafter otherwise expressly provided." This exception referred to two subsequent provisions of the lease, the first being a provision and condition that, if the demised premises should, "by fire, be destroyed or so injured as to be untenantable," the tenant should not be bound to repair or rebuild the same, and might, by written notice, cause the yearly rent to abate proportionally until the premises should be restored or repaired by the landlords, and that, in case of receiving such notice, the landlords, within a reasonable time thereafter, might at their option, by a like notice, end the term, in which case rent should be paid only to the time of destruction or injury; and the second a provision reading "that, upon written request from the parties of the second part, specifying the same and the necessity thereof, such repairs as are found to be necessary will be made to or upon the demised premises by the parties of the first part, who reserve the right to enter upon the premises for the purposes of such repairs and of due inspection concerning the same." By the sublease to the defendants in this

action, the Bartletts agreed that, upon written request from the tenants, they would make such repairs as were caused by ordinary wear and tear, and were found to be necessary, reserving the right to enter upon the premises at all reasonable times for the purpose of making such and any and other repairs and of due inspection. In the clause in the sublease providing for such repairs, the words "or rebuilding" had been stricken out. Before this omission, made upon execution, the wording of the sublease had been such as to reserve the right to the landlords to enter upon the premises at all reasonable times for the purpose of making repairs or rebuilding. The sublease contained another provision, in the following words: "It is further agreed between the parties hereto that if during the term of this lease, either of the piers, bulkheads, or sheds, or any of them, are destroyed by fire or other elements, or so injured as to be untenantable or unfit for occupancy, a proportionate part of the rent for such part of the premises as are thus injured or destroyed shall cease until such premises are rendered tenantable, the parties of the first part [the landlords] having the option to repair or rebuild such premises or such part as may be injured or destroyed."

By an express provision of the sublease, it was agreed that that lease should be subject to the covenants, conditions, and agreements of the principal lease, except the covenant to pay rent. Prior to the appointment of the plaintiff as receiver, the Prentice executors employed contractors, who entered upon the demised premises as early as April or May, 1894, and did work thereon which was not completed earlier than July 30, 1894. I am satisfied that what they did, besides repairs proper, amounted to a rebuilding of one of the piers rented to the Sandersons by the sublease. It was conceded upon the trial that, if any legal damage was thereby caused to the Sandersons, its measure in money was $3,103.32. It was also admitted that the entry was not at the request or with the formal consent of either of the parties to this action, or of the Union Warehouse Company. Promptly after the appointment of the plaintiff as receiver, the attorneys for the Sandersons notified him that their clients claimed demurrage on vessels, and allowance for interruption of their occupation of the demised premises. In addition to verbal notice, they sent him on June 13th a copy of a letter from the Sandersons, in which the latter mentioned a verbal arrangement with E. B. Bartlett for demurrage on lighters, the unloading of which was prevented by the repairs proper; claimed the right to a reduction of rent during the rebuilding of pier No. 2; and suggested an amicable arrangement with the receiver in reference to both allowances. The rent under the sublease was payable in advance, in equal monthly installments of $4,375. The attorneys for the Sandersons responded to the receiver's demand for payment of the installment which fell due July 1, 1894, by calling his attention to their claims against him, which they wanted adjusted before they paid any rent.

On July 18 or 19, 1894, the plaintiff accepted from them, in full payment of the July rent, a check for $1,271.68, being the difference between the July rent for $4,375 and $3,103.32, and signed a paper, the material part of which is as follows:

"New York, July 18th, 1894.

"Messrs. Sanderson & Son, Agents, Nos. 21 & 22 State Street,
        "To E. B. Bartlett & Co., Dr.

| | | |
|---|---:|---:|
| July 1, to rent of piers, Prentice Stores, month ending 31st inst., as per lease | | $4,375 00. |
| Less deductions as agreed: | | |
| ½ rent pier 2, June 1 to 23rd, inc. | $ 630 14 | |
| Entire rent pier 2, June 23rd to 30th | 383 56 | |
| Entire rent pier 2, July 1st to 31st | 1,698 62 | |
| Extra expenses trucking cargo, demurrage on boats, lighterage, &c. | 391 00 | |
| | | $3,103 32 |
| | | $1,271 68 |

"Wm. W. Goodrich, Recr. U. W. Co."

The amount of the deductions appears to have been adjusted by negotiation between the Sandersons and a Mr. Woodruff, who, prior to the appointment of the receiver, had been vice president of the Union Warehouse Company. The receiver appears to have claimed the right to have a similar deduction made in his favor by the Prentice executors. They refused to make it, sued him for rent, and obtained judgment in full; Mr. Justice Gaynor, before whom the action was tried, delivering a brief opinion, to the effect that, if the acts of the Prentice executors amounted to a trespass, that would not excuse the lessees, Sanderson & Son, from paying their rent to the Union Warehouse Company, it not having been a party to the trespass, and that the receiver of the Union Warehouse Company could not therefore allow any deduction of rent to Sanderson & Son. The judgment entered upon this decision has been affirmed by the appellate division in the Second department. See Prentice v. Goodrich, 36 N. Y. Supp. 740.

The action referred to me is brought to recover as rent the said amount of $3,103.32. The complaint demands $3,180, but the actual amount in controversy is $3,103.32. The issues referred to me arise only upon the answer of the defendant Oswald Sanderson, which alleges a breach of the covenant of quiet possession, and an agreement with the plaintiff adjusting damages at $3,103.32. By a separate paragraph, the answer sets up the settlement made in July, 1894, as an account stated and an accord and satisfaction. It also alleges that, prior to the commencement of this action, the plaintiff had assigned the cause of action to a corporation known as the Brooklyn Wharf & Warehouse Company.

I am satisfied that the cause of action has not been assigned by the plaintiff. The formal assignment executed by him and the schedule subsequently prepared and agreed upon between him and the purchaser are, in my judgment, to be read together, and the specific language of the schedule controls the general language of the assignment itself. Besides, the amount of the consideration paid was calculated from the schedule, which does not mention the rent claimed to be due from the Sandersons. I am not satisfied whether the defendants had at any time a valid offset or counterclaim against the rent due under the lease for the interruption of their possession. They clearly had none under the covenant for quiet possession. The words "or any person whomsoever" are usual words in such a covenant, and the authorities, including, of course, the opinion of Mr. Justice Gaynor, are decisive that that covenant in a lease is not broken by the intrusion of any person other than the landlord, those acting under his authority, or some one having a paramount title to his. I am, however, satisfied that, in negotiating for a settlement, the defendants pressed their claim in good faith, and that it was conceded as a valid claim by the plaintiff in equally good faith, and the amount adjusted by negotiation, the result of which both parties accepted.

Reserving for later discussion the question whether the plaintiff, as receiver, had power to settle with the Sandersons, I have reached the conclusion that, as between parties acting sui juris, the settlement in July, 1894, would have been a perfect and binding accord and satisfaction. The case of Fuller v. Kemp, 138 N. Y. 231, 33 N. E. 1034, states the rule to be that "there must be present, in the transaction upon which it [an accord and satisfaction] rests, all the elements of a complete agreement,—a lawful subject-matter, a sufficient consideration, and the aggregatio mentium or mutual assent of the parties." These elements appear to me to have been present in the transaction in question. The subject-matter included the plaintiff's claim for rent, and the claim of the tenants for reimbursement on some ground for the interference with their possession. The latter was an unliquidated claim, and its adjustment at a fixed sum, so that the tenants could not claim more, furnished, in connection with the payment of the balance, a sufficient consideration. Were the controversy between parties acting sui juris, the mere fact that the payment was made by a negotiable instrument bearing indorsement would furnish a consideration. Kellogg v. Richards, 14 Wend. 116. As I find other good consideration, I do not feel bound to consider whether the rule as to accord and satisfaction by negotiable instrument is applicable to transactions with a receiver. The receipt by the plaintiff of the defendants' check.

for the balance agreed upon as due, taken in connection with the statement
of account which he signed, proves the meeting of the minds of the parties.

It was argued on behalf of the plaintiff that there were several reasons
why the settlement was not binding as an accord and satisfaction. Among
other things, stress was laid upon an expression which occurs in some of the
cases on the topic,—that it is a requisite to a valid accord and satisfaction
that there should have been a disputed claim. It does not seem to me that
it would add anything to the strength of the plaintiff's case if I were to hold
that he did not dispute the defendants' claim to an offset. If so, it must be
on account of some purely technical rule, because to the ordinary mind an
undisputed claim would naturally appear to furnish at least as good a consid-
eration for a settlement as the same claim if it were disputed. I do not think
that the use of the word "disputed," in the cases cited by plaintiff, means
that one who omits to dispute a claim may afterwards insist that a settlement
of it was invalid on account of that omission. However this may be, I think
that there was in fact a dispute between the receiver and the Sandersons pre-
ceding the settlement of July 18, 1894. Immediately after the appointment of
the receiver, he was notified that the defendants expected a rebate of rent
and other compensation for the interference with their possession of the pier.
On or about July 1, 1894, he demanded payment of the July rent. The claim
of the Sandersons was called to his attention as ground for their refusal to
pay until it should have been adjusted. On July 17, 1894, he wrote to the
attorneys for the Sandersons, saying: "Will you kindly arrange for the
payment of the Wilson rent? I believe our clients have agreed upon the
amount of deduction to be made, & the month is more than half gone. I
hear that the pier will be completed on 20th inst." I think that this letter
shows that there had been matter requiring adjustment, and I can see no
distinction between such matter and matter in dispute. Furthermore, the re-
ceiver's attorney had meanwhile threatened to sue for the July rent, and the
Sandersons' attorney had suggested the determination in such an action of
their claim for a deduction.

It is further argued that the Sandersons' claim was admitted in full, and,
therefore, that there was no dispute and no compromise, and that it follows
that there was no accord. I do not find any evidence whether or not the
Sandersons had ever claimed more than was allowed them, but I am entirely
clear that their claim was an unliquidated one prior to the agreement referred
to in the receiver's letter of July 17th. Even if the amount of the demurrage
could be regarded as a liquidated item, I cannot find any evidence that, prior
to that agreement, there was anything binding either party as to the relative
rental value of pier No. 2.

The plaintiff construes the admission that $3,103.32 was the actual amount
of the damage as a concession that that sum was the Sandersons' whole
claim allowed in full. I am not sure that I ought so to construe the admis-
sion. At any rate, I cannot see that the effect of that admission is to remove
from the case the actual fact that prior to the settlement of July 18, 1894,
neither party was bound to any definite figure.

Nor can I agree with the contention that there is no accord unless there
is compromise. I do not find any case so holding. It seems to me that the
case of Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715, is inconsistent with
such a proposition. In that case the facts stated indicate that the only dis-
pute was whether the plaintiff was entitled to 1 per cent. upon $30,000, or 5
per cent. upon the same sum. The defendant sent him a check for $300,
with a request that he sign a voucher in full. He collected the check, sent a
receipt on account, and brought action for $1,200. The jury found that, ac-
cording to the original agreement upon which he sued, his compensation was
to have been at the rate of 5 per cent., and, further, that he had not agreed
to accept the $300 in full settlement. The court decided that an accord and
satisfaction was so conclusively established as to leave no question for the
jury upon that subject. It is obvious that there had been no compromise on
the part of the defendant. He had paid the exact amount admitted by him
to be due. The case of Miller v. Coates, 66 N. Y. 609, was on the plaintiff's
brief, so that the attention of the court was doubtless called to the point.

The plaintiff further urges that an offset is not the equivalent of a payment,

and cites Renard v. Fiedler, 3 Duer, 318. I do not think that that case draws: any distinction between an erroneous payment of money and an erroneous allowance of deduction. In my judgment, the transaction which took place between the plaintiff as receiver and the Sandersons is subject to no different' construction than if Sanderson & Son had drawn and delivered to the plaintiff a check for $4,375 for rent, and he had drawn and delivered to them a check for $3,103.32 in payment of their claim. It seems to me that there is no legal difference between the payment by one party of the balance of an account stated and the payment by each party of the gross amount to his debit before a balance is struck.

It is urged that the same case of Renard v. Fiedler is authority for the proposition that, if the plaintiff made an error of law in allowing the deductions,. he may recover. It is true that it was argued by the defendant in that case that the error made by the plaintiff was one of law; but all that the court said on the topic was that the doctrine as to payment under mistake of law was laid down by the counsel for the defendant in much broader terms than the decisions warranted, and later in the opinion it is said that "an error of calculation, no matter, from what cause it arises, may in all cases reasonably be considered as a mistake in fact, and not in law." The weight of authority seems to be in favor of the proposition that a valid accord and satisfaction may be founded upon an untenable claim (Bank v. Geary, 5 Pet. 99,. 114; Pitkin v. Noyes, 48 N. H. 294; Fisher v. May's Heirs, 2 Bibb, 449),. though not upon an illegal claim, such as a note founded upon a transaction· forbidden by statute (Kidder v. Blake, 45 N. H. 530), or one utterly without foundation, and known to be so (Pitkin v. Noyes, 48 N. H. 294, cited above).

The answer pleads, in substance, as a defense, that an account was stated between the plaintiff and the defendants; that the balance shown thereby was paid; and that thereby there was a complete accord and satisfaction. I think that, under these allegations, I may consider evidence of other subject-matter for a settlement than the claim under the covenant for quiet possession; and I do not think that the only ground upon which the defendants· claimed, and the plaintiff allowed, the deductions from the rent, was the supposed cause of action under that covenant, if in fact that ground was ever mentioned.

There was a provision of the sublease (materially different from that in the principal lease) for a suspension of rent under certain circumstances,. which provision was ambiguous as to whether a deduction should be made in case of injury of any kind rendering the premises or a part thereof untenantable, or only in case such injury was caused by fire or other elements.. The settlement of this doubt would, I suppose, depend upon the determination of the question whether the maxim, "Noscitur a sociis," applied to the construction of the clause in question, or not,—a question which I do not think it necessary to decide. It is enough to say that there is sufficient plausibility in the arguments in favor of the construction contended for by the defendants· to make the question one which furnished lawful subject-matter for an. accord and satisfaction. Again, it is hardly to be supposed that the superior landlords would have incurred the expense of rebuilding, unless they had discovered some injury rendering the premises untenantable or unfit for use. and this injury may have been by one of the elements. Water is an element in the same sense that fire is, and it is not unlikely that the damage to pier· No. 2, which made rebuilding necessary, was caused by water. There was.. therefore, at least, plausibility, and, very possibly, justice, in the position that the subtenants were entitled, by the terms of their lease, to a suspension of' rent during the rebuilding. Further than this, they seem to have relied, to· some extent, on an arrangement with E. B. Bartlett. It does not seem to be by any means impossible that Bartlett had bound the Union Warehouse Company to some arrangement with the Sandersons, which was binding upon the· receiver of that company. The paper which the receiver signed on July 18th. and some of the circumstances, indicate a relation between E. B. Bartlett &· Co. and the Union Warehouse Company, without defining it. I do not consider it incumbent upon the defendant to show the relation of Bartlett & Co. to the· warehouse company, or otherwise to prove the validity of the claims which were settled; otherwise, there would rarely be any use in relying upon an.

accord and satisfaction.  Bank v. Geary, supra; Fisher v. May's Heirs, supra.

The topic which remains for consideration is whether the receiver had power, under the order appointing him, to make an accord and satisfaction.  The Revised Statutes (2 Rev. St. p. 469, § 68; 1 Birdseye's 1st Ed. p. 696, § 116) confer upon the receiver of a corporation, appointed upon its voluntary dissolution, the powers of trustees of insolvent debtors.  Section 1788 of the Code defines and limits the powers of a temporary receiver, but section 1789 confers power upon the court to grant such a receiver the additional powers specifically provided in that section.  Section 1788, which took effect in 1880, contains the first statutory distinction which I have been able to find between temporary and permanent receivers of corporations.  The Code does not define the powers of permanent receivers.  The provisions of the Revised Statutes on that topic were intentionally allowed to stand.  See Throop's note to section 1789.  These sections of the Code apply only to actions for the sequestration of property of a domestic corporation, or for its dissolution.  Prior to the enactment of the Code, the powers of receivers in sequestration proceedings, even before final judgment, were, under Laws 1852, c. 71, the same as those of a receiver appointed in case of the voluntary dissolution of a corporation.  The exact language of the order appointing the plaintiff receiver is "with the usual powers and duties of receivers according to the laws of this state, and the practice of this court, including," etc.  The expression "laws of this state" seems to me to include any statutes defining the powers of receivers of corporations, although in this instance the corporation was a foreign one, and the appointment was ancillary to a receivership in New Jersey, and was therefore made in the exercise of the general common-law powers of the court, and not in pursuance of the provisions of the Code, as to the appointment of either temporary or permanent receivers of domestic corporations.  Until the passage of the act of 1852, above cited, the only statute of this state defining the powers of receivers of corporations conferred upon them the same powers as those of trustees of insolvent debtors; so that for many years the usual statutory powers of receivers of corporations were the same as those of such trustees.  By the act of 1852, above referred to, these powers were expressly conferred upon receivers appointed before judgment in actions for sequestration, so that, at least from 1852 until the passage in 1880 of section 1788 of the Code, there was no statutory distinction between the powers of receivers of corporations appointed before and after judgment.  Section 1788 of the Code, by its terms, applies only to a limited class of actions, and leaves the law in regard to the powers of receivers unchanged in all other respects.  The provisions of the Revised Statutes, on the contrary, apply, not only to permanent receivers appointed in the class of actions mentioned in section 1788 (Laws 1880, p. 368, c. 245, § 1, par. 3, subd. 5), but to receivers appointed in proceedings for the voluntary dissolution of corporations.  See Throop's note to section 2429.  It seems to me, therefore, that the phrase "usual powers and duties of receivers according to the laws of this state" is better satisfied by reference to the older and more general statute than to the later and more limited one.  There is also, I think, evidence in the language of the order that the court intended to confer upon the receiver all the powers defined in any statute of this state generally applicable to receivers of corporations.  I think that if it had been intended to limit his powers to those of a temporary receiver, under section 1788, there would have been some appropriate reference to that section.

My general conclusion on the topic of the extent of the receiver's powers is, therefore, that, except so far as they were limited by the very fact that his appointment was ancillary, the order conferred upon him the powers of trustees of insolvent debtors, as defined in 2 Rev. St. p. 41, § 7 (3 Birdseye's 1st Ed. p. 3190, § 77).  By the eighth subdivision of this section, power and authority are conferred upon the trustees "to settle all matters and accounts between such debtor and his debtors or creditors. * * *"  The ninth subdivision is in the following words:  "(9) Under the order of the officer appointing them, to compound with any person indebted to such debtor and thereupon to discharge all demands against such person."  I am satisfied that what was done amounted to a settlement, rather than a composition, and that it was not necessary to its validity that it should receive the express sanction

of the court. It seems to me that the act distinguishes between a "settlement" of accounts or other matters needing adjustment, and a "composition," —i. e. the acceptance of less than an amount known to be due. Haskins v. Newcomb, 2 Johns. 405.

The plaintiff cites cases in which the courts have held it proper to grant special power to receivers to compromise. It is perhaps implied in some of them that a receiver ought not to compromise without submitting the matter to the court; but I find no expression that a receiver is without power to compromise disputed matters if he will take the responsibility of doing so. I do not suppose that Mr. Justice Gaynor, in saying that "the receiver could not allow a deduction," intended to be understood as passing upon the powers of the receiver as distinguished from his legal rights. The question before him for decision was not strictly whether the receiver might properly make a deduction in favor of the Sandersons under the terms of their lease, but whether he could do so on any such ground as would give him a claim against the superior landlords. In Re Bank, 18 N. Y. 199, at page 213, Judge Denio, citing the provisions of the Revised Statutes above referred to, says: "The receiver is authorized to adjust and settle the claims of creditors by mutual agreement. * * *" It seems to me that the sanction for this statement must be found in the eighth subdivision, above quoted, and, therefore, that he has the same power to settle by agreement with debtors to the corporation. The remark which follows, that "he has no judicial authority," does not, I think, imply that he cannot close with a debtor to the estate so as to complete the settlement. He must do so in order to get in the assets. He cannot pay a creditor until authorized to make dividends, but it is his duty, after stating an account with a debtor, to collect the balance due. A number of cases have been cited from which the plaintiff reasons, by analogy, that the action of the receiver was ultra vires. Such cases are Wisconsin Cent. R. Co. v. U. S., 164 U. S. 190, 17 Sup. Ct. 45; Logan Co. v. U. S., 169 U. S. 255, 18 Sup. Ct. 361; Village of Ft. Edward v. Fish, 156 N. Y. 363, 50 N. E. 973. The rule laid down by these cases is that a public officer cannot exceed the powers conferred upon him by statute. What I hold in this case is that the receiver acted within the authority conferred upon him by the order of appointment. I think, therefore, that the accord and satisfaction should be sustained as a settlement of an "account or other matter" between the Union Warehouse Company and its debtors. Although the rent accrued after the appointment of the receiver, I suppose that, from a strictly technical point of view, the tenant's indebtedness was to the company, although the receiver might sue for it.

Section 67 of the act (2 Rev. St. p. 469) vesting in a receiver the title to property applies only to domestic corporations, and there is no reference to its provisions in the order of appointment. But, in any case, the receiver was, I think, under the power conferred upon him to carry on the business of the company, authorized to make such a settlement as he deemed proper of the matters in suit. The principal lease covered certain warehouses, in addition to the piers sublet to the Sandersons. The exercise of the authority to continue the business of storing goods obviously required that the receiver retain the warehouses. To keep possession, he must pay the superior landlords their rent in full, and I think that, by the necessity of the situation, the business which he was to carry on included any necessary dealings with the subtenants. He could, of course, have applied to the court for instructions; but I think he had power to settle with them without such an application, if he chose to take the responsibility of doing so. His authority to transact business included, by necessary implication, power to make bargains in the course of business in like manner as the company might had he not been appointed.

It may be proper, although unnecessary to the decision of this case, to add that I think it probable, from the evidence, that the exigencies of the situation were such that it was better for the receiver, in the exercise of a wise judgment, to make an immediate settlement, even at a sacrifice, than to pursue his legal remedy, or even to postpone the settlement until he could ask instructions from the court which appointed him. Such instructions would have been of doubtful value as a protection, unless obtained after notice to creditors; and this might well have consumed more time than he could procure

the superior landlords to grant. The representative of the superior landlords attended at the time of settlement. The receiver drew a check for $2,000 on account, and handed it to him, with a remark to the effect that that was the best he could do for him then. This and other circumstances, which have little, if anything, to do with the issues referred to me, indicate a preceding situation such as to justify the receiver in making immediate settlement for the sake of obtaining some funds at once, and insuring the prompt payment of future installments of the Sandersons' rent. A proceeding to dispossess him and the company for nonpayment of rent due the Prentice estate could have been prosecuted to actual eviction under a warrant earlier than the joinder of issue in any action he could bring against the Sandersons for rent. The Sanderson lease was a valuable asset, and the receiver was very properly reluctant to bring a dispossess proceeding. I do not allude to these considerations to fortify my conclusion that the receiver had power to make a settlement, but only for the purpose of pointing out that the proposition that the settlement is binding by no means implies fault or delinquency on the part of the receiver. I think that it is my duty to consider the matters in controversy in the light of the circumstances as they existed on or before July 18, 1894, and that I ought not to ignore any doubt which then existed as to the legal rights of the parties, even if since then the courts had authoritatively settled all such doubt. Bank v. Geary, 5 Pet. 114. But, in fact, what has been authoritatively held is, at most, that the Sandersons had no right to a deduction such as to give the receiver a valid counterclaim against the superior landlords. I do not think that it necessarily follows that the receiver erred in allowing deductions. A comparison of the leases shows such differences in their provisions as might entitle the subtenants to deductions from rent due to their immediate landlord, although the latter would have no right to any deduction from rent due the Prentice estate.

Upon the whole, I am of opinion that the receiver had power to settle with the subtenants as he did, and that the settlement was and is valid.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and PATTERSON, JJ.

Edward B. Whitney, for appellant.
Giraud F. Thomson, for respondent.

PER CURIAM. Judgment affirmed, with costs, on the opinion of the referee.