## JACKSON v. VOLKENING.

(Supreme Court, Appellate Division, First Department. March 13, 1903.)

1. ACCORD AND SATISFACTION.

   In an action for the balance of account alleged to be owing on the pur-
   chase price of blocks of marble, defendant introduced evidence that cer-
   tain blocks formerly received from plaintiff were of such inferior grade
   as to be worthless; that he had refused to accept the same or pay for
   them; that he did finally pay for them under assurance by plaintiff that
   he would get justice; that plaintiff took no steps to adjust the difficulty;
   that, on winding up his business, defendant sent plaintiff a check in set-
   tlement in full of all claims, deducting the amount he claimed as rebate
   on some of the inferior marble, and canceling his claim for other deduc-
   tions, with instructions to return the check unless he accepted it on those

¶ 1. See Accord and Satisfaction, vol. 1, Cent. Dig. § 76. ·

conditions; that plaintiff cashed the check without further communication of any kind until the institution of this suit. *Held*, that such facts established, prima facie, an accord and satisfaction.

Appeal from Trial Term, New York County.

Action by Carl D. Jackson, doing business under the firm name and style of C. D. Jackson & Co., against Otto Volkening, doing business under the firm name and style of Volkening & Co. From a judgment for plaintiff, defendant appeals. Reversed.

The action was for $675.69. a balance of account and interest thereon, alleged to be owing by the defendant on the purchase price of certain marble, bought by two separate contracts in writing, dated the 30th day of April and the 29th day of June, 1901, respectively, and on the purchase price of a "Ko can of patent universal marble cement," and for lighterage on certain other marble. The amended answer confesses, and attempts to avoid, the plaintiff's claim by alleging an accord and satisfaction. The defendant assumed the affirmative, and at the close of this evidence the court, on plaintiff's motion, directed a verdict for the amount claimed in the complaint, and the defendant excepted.

The evidence adduced by defendant shows that prior to the transactions mentioned in the complaint he had purchased of plaintiff, among other things, three certain blocks of marble, described as "Blanc P. 11442" and "Blanc P. Block $\frac{12215}{1}$ and $\frac{12215}{2}$," cut in two pieces and numbered as indicated. The first of these blocks was purchased May 24, 1900, by an order in writing from defendant to plaintiff which contained the following: "We herewith purchase from you the following six blocks of Blanc P. marble ex S. S. Tartar Prince. * * * The price as agreed, for blocks containing less than twenty-five (25) cubic feet, $4.75 per cubic foot ex steamer. For blocks containing twenty-five (25) cubic feet or more, $5.50 per cubic foot ex steamer. Lighterage and transportation from steamer to our yard to be arranged for and paid by us. Blocks are to be invoiced according to Morton's measurements, which shall be final. We further agree to pay to you the full amount of your invoice in cash, inside thirty (30) days, less 3% discount. No claims in regard to measurements, quality, defects, loss or damage in transportation, etc., will be raised by us." The other two blocks were purchased to be delivered on arrival of the steamship Spartan Prince by similar contract dated January 17, 1901. Negotiations for the first order were conducted by defendant's father. The written order, filled out for signature, was sent by plaintiff to defendant by mail, to be signed and returned. The letter returning it contained the following: "In regard to the Blanc P., we will rely on Mr. Jackson's assertion that this is of the best quality and hope it will turn out to our satisfaction."

On arrival of the marble sold by the first contract or order, it was measured by Morton, designated in the contract for that purpose, and an invoice rendered under date of May 30, 1900. The amount of the invoice was paid July 6, 1900. The defendant's father testified that he first saw this block some time in June, and found that it was not "Blanc P."—i. e., not white marble—but was blue; that he had told plaintiff, before the marble was ordered, that defendant could not use the marble unless it was of first quality, and, after the marble was in the yard, that he repeatedly told plaintiff that defendant could not use the marble; and that plaintiff promised to "try to sell it somebody else"; that plaintiff suggested that the block be sawed, so that it could be determined just what quality it was, and that defendant did saw it, after it had been in the yard about ten months; and that it then appeared that it was not even useful for common Italian marble. On cross-examination he testified that it was discovered, before the marble was paid for, that it was not good marble, and that he told plaintiff that the defendant refused to pay for it, but that plaintiff said that he would have to pay for it or he could not have any more; that plaintiff had no yards, and the marble could not be taken back to his office, but that plaintiff "said he would take back the block."

Under date of May 22, 1901, defendant, after sawing said block of marble, wrote plaintiff as follows: "We are sorry to be again obliged to complain about another Blanc P. block A. M. F. 11442, which we have just sawn, and which is without question the vilest thing we have ever seen in Blanc P. It is, without exaggerating, no better than an F. M. or C. M. B. block, which you will agree to when you see it. Please call here yourself about it, as we are badly disappointed and sorry to have to complain. There must be some liberal concession made on this. Such stuff no one can be expected to take for Blanc P. We have also not heard from you yet in reference to the other two blocks of Blanc P., and the block of C. F., on which you have a rebate under consideration." Plaintiff replied thereto, under date of May 24, 1901, as follows: "We * * * beg to advise you that we forwarded your letter in original to our friends abroad, and shall not fail to advise you as soon as we receive their reply. You may depend upon us doing everything in our power to further your interests." Defendant testified that after these letters plaintiff promised over the telephone to call and look at the block, "and then he would be able to make an adjustment of it when he got to Europe"; that Mr. Thiel, one of plaintiff's employés, came and looked at the block, and took away samples, and said "that he had never seen any Blanc P. like that before"; that there was a general blue cast in the whole marble; that Blanc P. should have "almost a white cast, or just a tinge of blue in the white, almost white"; and that he did not consider it Blanc P. of any grade, and that its defects were apparent before it was sawed. The marble of this block is still on hand in the yard of defendant's successor.

On March 1, 1901, the defendant wrote to the plaintiff concerning the other two blocks as follows: "We have just sawed your Blanc P. block $\frac{12215}{2}$ . It has turned out very poor. We are about to send you a check in settlement of your bill of Jan. 28th, but would like to hear from you first if you will not make some allowance on this block. It is sawed, and you can see it at any moment, and judge for yourself. It is no better than Italian marble. We wish you could call here tomorrow to get this matter adjusted, and we could give you a check in settlement. * * * We presume $\frac{12215}{1}$ is about the same color, but have not sawed it yet." The plaintiff replied: "* * * We beg to advise you that it is beyond our power to make any allowance on Blanc P. marble. We can only sell what we get, and we never sell this grade of marble guarantying the quality. It is absolutely impossible for the quarry owners and shippers to grade the quality before the stock is sawed. Therefore the prices are placed so low to average the quality. Anyhow, to please you, we have sent our Mr. Thiel to your factory to inspect this sawed block, and we shall report this matter truthfully to our shipper. If he is willing to make any allowance, then you are perfectly welcome to it."

On March 5, 1901, defendant sent plaintiff a check for the amount of two separate bills, including the block 12215, parts 1 and 2, less $660, the price of that block, and requested a separate bill therefor, the same to be settled later. Plaintiff refused to accept it and returned the check. Defendant testified that he then had a conversation with the plaintiff over the telephone, and that he must communicate with his people in Italy, but that defendant should feel easy and pay for the blocks, and would get justice the same as if he had not paid for them; that he believed plaintiff, and relied on his assurance; that plaintiff had allowed rebates before under similar contracts; that defendant had to have the material that plaintiff imported, and no one else imported it; that he had to sign the form of order in question in order to do business with the plaintiff, but plaintiff represented "that, in spite of signing those orders, if there was anything serious the matter with the marble, we would get fair play on it." Defendant's father testified that when block No. 12215, parts 1 and 2, were sawed, it was found that 25 per cent. was wasted in cutting out the colored portions.

On March 7, 1901, defendant again sent the check to the plaintiff, with another one for the $660, and the bills as rendered, and requested that the bills be receipted and returned. The bills were receipted and returned the following day. Defendant wrote plaintiff, again reminding him of the promised

rebate, on April 6, and again on May 6, 1901, but continued to deal with him, and purchased, among other things, the material described in the complaint. Payment of later bills was demanded by plaintiff, and defendant demanded an adjustment of the former matters. Plaintiff threatened suit. Defendant then sent plaintiff the following letter, with check inclosed:

"August 17, '01.

"Messrs. C. D. Jackson & Co., 1 Madison Avenue—Gentlemen: Enclosed we hand you check for $2,763.95 in full settlement of our account with you to date. We have deducted 25% of the value of Blanc P. blocks $\frac{12215}{2}$ and $\frac{12215}{1}$ on account of their poor quality, and have deducted the entire charge as billed to us by you of Blanc P. Bl. 11442, together with the cost of sawing. The latter block, sawed 64' 4", is therefore here stored for your expense and risk and on your account, with the new company, Rochert H. Reid & Co.. which has taken over our mill. This block is so poor that in spite of our best endeavors we could not get them to accept it in the transfer, even at the price of ordinary Italian marble. Had they been willing to take it that way, we would have asked your approval. as we have considered this block at your disposal ever since it was sawed, and your Mr. Thiel saw and inspected it at that time, and was asked to dispose of it. He acknowledged to the writer then that it was the poorest marble he ever saw. Below we give you memorandum of how we arrived at amount of our check. We have no other means of arriving at a settlement with you, as you have given us no satisfaction on these matters for months past. Our mill having gone into other hands, it is imperative for us to get our accounts adjusted as quickly as possible. In reference to the above claims, we have many times communicated with you over the phone with Mr. Jackson, and also with Mr. Thiel; also here verbally with Mr. Thiel. At all times we were given assurances that these claims would be adjusted, but nothing has come of it. We also wrote you many times about it, as follows (among other letters): March 1, 1901, we wrote you complaining of the poor quality and color of Blanc P. blocks $\frac{12215}{1}$ and $\frac{12215}{2}$. March 5 we sent you check deducting these two blocks, but you returned same with the promise that, although they were paid by us, our claim would be satisfactorily adjusted later. We then paid for them. Not hearing any more from you, we wrote you again on April 6 about these two blocks. Meantime having frequently made verbal requests for adjustment of Mr. Thiel and Mr. Jackson, we were always assured the matter would be satisfactorily adjusted as soon as they heard from Italy. Another month elapsed, and we wrote you on May 6 for adjustment on the two blocks, and also on a C. F. 53492 that had meantime turned out inferior. Again we received more assurances of early adjustment, and excuses that word had not yet come from Italy. Between April 6 and May 6 we continually made verbal requests at every opportunity for an adjustment. The claim we made on the C. F. block we are now going to release, in order to simplify the settlement, although entitled to a rebate on the same. It is not so serious a matter as the Blanc P. On May 22, 1901, we wrote you about the very poor quality of Blanc P. block 11442, which we had bought from you and just sawn. We also requested Mr. Jackson to call and look at it, before leaving for Europe, which he promised the writer over the 'phone, in order that he might adjust this matter on the other side with his people, he said. He did not call here, however, but sent Mr. Thiel, who acknowledged the rank quality of this block. Three months, nearly, have elapsed now, with no satisfaction for us on this block, although we were told the matter would be put before the shippers or firm in Italy and adjusted with us soon as reply came. Mr. Thiel took away samples of the best part of all of these blocks. The rankest of all is the last-mentioned block, and you and particularly your shippers know that they should not have been sold as Blanc P.. and particularly not for good quality. If our settlement is not satisfactory in full payment as marked on face of check, then please return same. The check is sent in full settlement of all claims against us to date, and to be used by you only under those conditions. You billed the Italian blocks July 12th, but we

80 N.Y.S.—70

received same only on July 16 or 17. We have at times heretofore paid you in advance of 30 days, and would have done this time, but for the upset we have been the last two or three weeks turning over this plant to the new company.

"Yours truly,                                            Volkening & Co."

The check was indorsed and used by plaintiff without protest or communication of any kind, and paid in due course of business.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, INGRAHAM, and LAUGHLIN, JJ.

Carlisle Norwood, for appellant.

Frederick Hulse, for respondent.

LAUGHLIN, J.   We think the defendant made out a prima facie case of accord and satisfaction, and, upon the undisputed facts in the record, in the absence of evidence that his claim to a rebate was made in bad faith, a verdict should have been directed for him, instead of for the plaintiff.   The rule of law is well established, undoubtedly, that, where a liquidated sum is due, the payment of part only, although accepted in satisfaction, is not, for want of consideration, a discharge of the entire indebtedness; but this rule is not looked upon with favor, and is confined strictly to cases falling within it.   Ryan v. Ward, 48 N. Y. 204–208, 8 Am. Rep. 539; Jaffray et al. v. Davis et al., 124 N. Y. 164, 26 N. E. 351, 11 L. R. A. 710; Kellogg v. Richards, 14 Wend. 116; Chicago, Milwaukee, etc., Ry. Co. v. Clark, 178 U. S. 333, 20 Sup. Ct. 924, 44 L. Ed. 1099.

In Kellogg v. Richards, supra, where the acceptance of a promissory note of a third party in payment of a larger liquidated claim was held to be a complete discharge, Nelson, J., said:

"It is true there does not seem to be much, if any, ground for distinction between such a case and one where a less sum of money is paid and agreed to be accepted in full, which would not be a good plea. * * * The rule that the payment of a less sum of money, although agreed by the plaintiff to be received in full satisfaction of a debt exceeding that amount, shall not be so considered in contemplation of law, is technical, and not very well supported by reason. Courts, therefore, have departed from it upon slight distinctions."

The compromise of a doubtful claim, however, is a good consideration for the payment of money, and, in the absence of fraud or mistake, the settlement cannot be subsequently questioned on the ground that the claim could not have been enforced.   Stewart v. Ahrenfeldt, 4 Denio, 189; Andrews v. Brewster et al., 124 N. Y. 433, 439, 26 N. E. 1024.

In the Jaffray Case, supra, the rule was stated and approved that:

"If there be any benefit, or even any legal possibility of benefit, to the creditor thrown in, that additional weight will turn the scale, and render the consideration sufficient to support the agreement. * * * All that is necessary to produce satisfaction of the former agreement is a sufficient consideration to support the substituted agreement. The doctrine is fully sustained in the opinion of Judge Andrews in Allison v. Abenroth, 108 N. Y. 470 [15 N. E. 606], from which I quote: 'But it is held that where there is an independent consideration, or the creditor receives any benefit or is put in a better position, or one from which there may be legal possibility of benefit to which he was not entitled, except for the agreement, then the agreement is not nudum pactum, and the doctrine of the common

law to which we have adverted has no application.' Upon this distinction the cases rest which hold that the acceptance by the creditor in discharge of the debt of a different thing from that contracted to be paid, although of much less pecuniary value or amount, is a good satisfaction, as, for example, a negotiable instrument binding the debtor and a third person for a smaller amount."

In the case at bar it is unnecessary to determine whether the defendant's claim for a rebate was valid and enforceable. The court will not inquire into the merits. It is sufficient if there was any plausible ground for a bona fide claim, and it was made in good faith; and it is immaterial whether the dispute arose over a question of fact or of law. General Electric Co. v. Nassau Electric Co., 36 App. Div. 510, 55 N. Y. Supp. 858, affirmed 161 N. Y. 656, 57 N. E. 1110; Hills v. Sommer, 53 Hun, 392, 6 N. Y. Supp. 469; Kine v. Farrell, 71 App. Div. 219, 75 N. Y. Supp. 542; Andrews v. Brewster, supra; Goodrich v. Sanderson, 35 App. Div. 546, 551, 55 N. Y. Supp. 881; Vorhis v. Elias, 54 App. Div. 412, 56 N. Y. Supp. 134, 67 N. Y. Supp. 1149; Whitaker v. Eilenberg, 70 App. Div. 489, 75 N. Y. Supp. 106; Zoebisch v. Von Minden et al., 120 N. Y. 406, 24 N. E. 795; Fire Ins. Assn. v. Wickham, 141 U. S. 564, 12 Sup. Ct. 84, 35 L. Ed. 860. The defendant clearly released his claim to the rebate, and canceled others for which he made no deduction. The settlement thereof would be binding upon him as well as upon the plaintiff; and the law will presume a benefit to the plaintiff and a loss to the defendant by the release of these claims. Andrews v. Brewster, 124 N. Y. 439, 26 N. E. 1024.

One block of marble did not answer the requirements of the contract at all, and might have been rejected. The weakness of defendant's claim lay in the fact that, with some knowledge of the quality of the marble, he paid for it; but the circumstances under which payment was made, it is contended, debarred the plaintiff from claiming an acceptance, or that the payment was voluntary. If the claim was asserted in good faith, as the evidence shows, even though it was invalid on account of a misunderstanding of the facts or of the law, it affords a sufficient consideration for the new agreement evidenced by the accord and satisfaction. Hills v. Sommer, supra. It was not denied that the defendant had not paid the balance of the account on which the claim is based; but he claimed an offset on account of rebates concerning other marble, for which the accounts between the parties showed that he had paid, and thus the balance of the account or the extent of the defendant's liability was disputed.

In Nassoiy v. Tomlinson, 148 N. Y. 326, 42 N. E. 715, 51 Am. St. Rep. 695, the plaintiff claimed a commission of 5 per cent. for selling the defendant's farm. The defendant did not dispute the employment or the rendition of the services, but controverted the rate of commissions; he conceding his liability for 1 per cent. The defendant inclosed a check for $300 to the plaintiff, that being the amount of the commissions figured at the rate of 1 per cent., with a blank receipt reciting that it was in full, which he requested the plaintiff to sign and return. The plaintiff used the check and did not sign or return the receipt. The court held that this was an unliquidated demand within the rule, and that it did not become a liquidated demand, even as to

the amount for which the defendant conceded his liability; and, although the defendant received no benefit, having paid only the amount which he did not dispute, yet it was held that this constituted an accord and satisfaction. I see no difference in principle between that case and this; and that there is no difference, in the application of this rule concerning an accord and satisfaction, between a dispute directly involving the claim upon which an action is founded and an offset claimed against the same, is established by high authority. Ostrander v. Scott, 161 Ill. 339, 43 N. E. 1089; Tanner v. Merrill, 108 Mich. 58, 65 N. W. 664, 31 L. R. A. 171, 62 Am. St. Rep. 687; Chicago, Milwaukee, etc., Ry. Co. v. Clark, supra.

The case is this: The plaintiff had a claim against the defendant for a balance of account. The defendant in good faith asserted something more than a colorable claim as an offset thereto. Thus the defendant's liability became unliquidated, and he tendered the plaintiff a check in full settlement, and imposed as a condition that its acceptance and use should constitute full satisfaction of the plaintiff's demand against him. This I think constitutes an accord and satisfaction within all the authorities. Moreover, it is by no means clear that the plaintiff's claim, standing alone, was liquidated. The contract furnished the basis of liability; but the amount depended upon the measurement of the marble and the lighterage to be agreed upon.

It follows, therefore, that the judgment should be reversed, and a new trial granted, with costs to appellant to abide the event. All concur.